**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| DEXTER SAFFOLD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No.    14cv07468 |
| v. | ) | |
| | ) | Judge John Robert Blakey |
| SOUTH SUBURBAN COLLEGE, | ) | |
| | ) | Magistrate Judge Martin |
| Defendant. | ) | |
| | ) | |

<u>**PLAINTIFF'S RESPONSE TO DEFENDANT'S
RULE 56.1 STATEMENT OF MATERIAL FACTS**</u>

NOW COMES the Plaintiff, DEXTER SAFFOLD, by and through his recruited counsel, BRYAN HOFELD, and pursuant to United States District Court for the Northern District of Illinois Local Rule 56.1, herewith submits his Response to Defendant's Rule 56.1 Statement of Material Facts and his Rule 56.1 Statement of Additional Facts That Require the Denial of Defendant's Motion for Summary Judgment:

1.     Plaintiff registered for defendant's GED program on September 8, 2014 and the GED class began on September 15, 2014.

**Response**: Not disputed.

2.     The GED program is part of defendant's Adult Education Department, is grant funded and GED students pay no tuition.

**Response**: Not disputed.

3.     Defendant had a policy in effect during the fall 2014 semester that two absences in the first two weeks of class will result in a student being dropped from the class.

**Response**: Disputed.  Plaintiff was not provided with any such policy for the fall 2014 semester.  (Plaintiff's dep., attached hereto as Exhibit A, p. 50)

1



**PLAINTIFF'S
EXHIBIT
2**

4.     Plaintiff was absent from class on September 15, 2014 and September 18, 2014 and was dropped from the class in accordance with defendant's attendance policy.

**Response**: Disputed.  Plaintiff attended class on September 15th and 18th. (Exhibit A, p. 7-8) Plaintiff was never told he was dropped from class because he was absent. (Exhibit A, p. 49) Plaintiff was dropped from class because of his disability.  (Exhibit A, p. 10, 12-14, 27-28, 30-31, 36, 51, 53)

5.     Defendant's Adult Education Department was aware that plaintiff had an Academic Accommodation Passport from defendant's Students with Disabilities Office for the fall 2014 semester.

**Response**:  Not disputed.

6.     Plaintiff applied for and received academic accommodations for his visual impairment disability from defendant's Students with Disabilities Office for the fall 2014 semester as set forth in plaintiff's fall 2014 academic accommodation passport.

**Response**: Not disputed.

7.     Plaintiff's fall 2014 academic accommodation passport contains every accommodation that can be given to a student who is visually impaired.

**Response**: Not disputed.

8.     On September 18, 2014, plaintiff met with defendant's Dean of Student Services, Ms. Patrice Burton, and was scheduled to meet with Ms. Gail Bonds Carpenter and Dean Burton at 9:00 a.m. on Monday, September 22, 2014, to discuss possible modifications to plaintiff's academic accommodations, but plaintiff did not appear for the meeting and did not attend any more GED classes.

**Response**: Partially disputed. Plaintiff met with Ms. Burton on September 19th and did not ask Ms. Burton for a modification to his accommodations or for anything else. (Exhibit A, p. 37, 47)

9.      Plaintiff had previously requested, applied for and received modifications to his academic accommodation passport for the fall 2013 semester, a year prior to the events at issue in this case.

**Response**: Not disputed.

10.      In 2013, a year prior to the events at issue in this case, plaintiff received a modification to his fall 2013 academic accommodation passport which included a tape recorder and video magnifier to be used on campus only.

**Response**: Not disputed.

## PLAINTIFF'S RULE 56.1 STATEMENT OF ADDITIONAL FACTS THAT REQUIRE THE DENIAL OF SUMMARY JUDGMENT

11.      The accommodations plaintiff applied for based on his visual impairment disability and was granted for the fall 2014 semester included a note-taker. (Plaintiff's fall 2014 academic passport, attached hereto as Exhibit B, bullet point no. 3)

12.      Once classes actually began, plaintiff was not provided with a note-taker or any other accommodations listed in his fall 2014 academic passport. (Exhibit A, p. 16, 10, 24, 52, 66; plaintiff's answers to interrogatories, attached hereto as Exhibit C, plaintiff's answer to interrogatory no. 6)

13.      Plaintiff was told by Gail Bonds Carpenter, manager of the students with disabilities office, that defendant could not accommodate blind people like him and he was being dropped from the program because of his disability. (Exhibit A, p. 10, 12-14, 27-28, 30-31, 36, 51, 53)

14. Plaintiff attended class on September 15th, 16th, 17th, 18th and 19th. (Exhibit A, p. 7-9)

15. On September 18th plaintiff left class to go to the office to ask Ms. Bonds why the note-taker was not there. (Exhibit A, p. 12-13)

16. Gail Bonds Carpenter testified that a note-taker was provided and denied making the statements attributed to her by plaintiff. (Gail Bonds Carpenter's dep., attached hereto as Exhibit D, p. 13, 15, 27-29, 34-35)

This 1st day of June, 2016.

*By:* /s/ Bryan Hofeld

Bryan Hofeld
bhofeld@hofeldandschaffner.com
Counsel for the Plaintiff
Hofeld and Schaffner

## CERTIFICATE OF SERVICE

I hereby certify that on June 1, 2016, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the CM/ECF participants registered to receive service.

*By:* /s/ Bryan Hofeld

Bryan Hofeld
bhofeld@hofeldandschaffner.com
Counsel for the Plaintiff
Hofeld and Schaffner

30 N. LaSalle Street
Suite 3120
Chicago, IL 60602
(312) 372-4250

4

1

Deposition of Dexter Saffold - April 12, 2016

1           IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

**CERTIFIED**

3   DEXTER SAFFOLD,                    )
4           Plaintiff,                 )   **TRANSCRIPT**
                                       )
5       vs.                            )   14-cv-07468
                                       )
6   SOUTH SUBURBAN COLLEGE,            )
                                       )
7           Defendant.                 )
                                       )
8

9           The deposition of DEXTER SAFFOLD, called

10  by the defendant for examination, pursuant to

11  notice, and pursuant to the rules of Civil

12  Procedure for the District Courts of the United

13  States, taken before Loretta K. Adams, a Notary

14  Public and Certified Shorthand Reporter within

15  and for the County of Cook and State of Illinois,

16  at 33 North Dearborn Street, Suite 1530, Chicago,

17  Illinois, on the 12th day of April, A.D., 2016,

18  at 2:30 o'clock p.m.

19

20

21

22

23  Reported for
    VICTORIA LEGAL + CORPORATE SERVICES, by
24  Loretta K. Adams CSR, RPR

                Victoria Legal + Corporate Services
                800.827.7708  www.victorialcs.com


PLAINTIFF'S
EXHIBIT
A

2

Deposition of Dexter Saffold - April 12, 2016

```
 1                    A P P E A R A N C E S

 2    PRESENT:

 3
          MR. BRYAN S. HOFELD
 4
              HOFELD and SCHAFFNER
 5            30 North LaSalle Street
              Suite 3120
 6            Chicago, Illinois  60602
              (312) 372-4250
 7            bhofeld@hofeldandschaffner.com

 8            appeared on behalf of the Plaintiff;

 9

10        MR. DANIEL E. CANNON

11            KUSPER & RAUCCI
              33 North Dearborn Street
12            Suite 1530
              Chicago, Illinois  60602-3114
13            (312) 332-5000
              dec@kusperraucci.com
14
              appeared on behalf of the Defendant.
15

16
              *       *       *       *       *
17

18

19

20

21

22

23

24
```

Deposition of Dexter Saffold - April 12, 2016

```
 1                        I N D E X

 2                      Dexter Saffold

 3

 4

 5

 6

 7    EXAMINATION BY                      PAGE:LINE

 8    Mr. Cannon                             4:1

 9    Mr. Hofeld                            61:2

10    Mr. Cannon (Further)                 66:11

11    Mr. Hofeld (Further)                 67:2

12

13

14

15

16    EXHIBITS                            PAGE:LINE

17    Deposition Exhibit

18    No. 1                                 4:1

19

20

21

22

23

24
```

Deposition of Dexter Saffold - April 12, 2016

```
 1                    (Whereupon Saffold Deposition
 2                     Exhibit No. 1 was marked for
 3                     identification.)
 4                    (Witness sworn.)
 5                    DEXTER SAFFOLD,
 6    called as a witness herein, having been first
 7    duly sworn, was examined and testified as
 8    follows:
 9                    EXAMINATION
10    BY MR. CANNON:
11       Q.  Would you state your name for the record
12    please.
13       A.  Dexter Saffold.
14       Q.  Thank you.  Have you ever given a
15    deposition before?
16       A.  Years ago.
17       Q.  Okay.  Well, I'm going to ask you some
18    questions, and I need you to answer out loud like
19    you're doing so well right now.  And try to avoid
20    those common things we all do, like going like
21    this (indicating).  You have to say yes or no,
22    you can't nod your head or give signals, the
23    court reporter can't take that down.
24                    Let me finish my question, even though
```

Deposition of Dexter Saffold - April 12, 2016

1    you might think you know what it is.  Again the

2    court reporter can't take down both of us

3    speaking at the same time.  I'll let you speak

4    until you're done, we'll work together like that,

5    okay?

6        A.   Um-hmm.

7        Q.   What did you say?

8        A.   Okay.

9        Q.   Okay, thank you.  And if you don't

10   understand a question, just say I don't

11   understand and I'll ask it again.  My questions

12   aren't always perfect, I get that.

13            And as I mentioned off the record, if

14   you need a break at any time, just raise your

15   hand or say hey Mr. Cannon, can we take a break.

16   There's no problem with that, it's ordinary and

17   usual.

18            I'm going to ask you some questions

19   about the lawsuit you filed against South

20   Suburban College.  As you know, I represent South

21   Suburban College.  So what I'm going to do is

22   I've asked the court reporter and she has already

23   marked this document as Exhibit 1, and I'll give

24   a copy to Counsel and to you.

Deposition of Dexter Saffold - April 12, 2016

 1              This is a document with --

 2      A.  Excuse me, one thing.  Since I'm visually

 3  impaired, I can't read or make out small print.

 4      Q.  Yes, well, just wait until I ask you a

 5  question.  I don't think it's going to be an

 6  issue, okay?

 7      A.  Um-hmm.

 8      Q.  All right.  This document is stamped as

 9  Document No. 12 in the lawsuit of Dexter

10  Saffold versus South Suburban College,

11  Case No. 14 CV 07468, it's entitled first amended

12  complaint filed on January 28, 2015.  So that's

13  the document we're working off of.

14              Let me just start by asking you some

15  questions.  You don't have to worry about what

16  that document says right now.

17      A.  Okay.

18      Q.  So you registered for a GED class in the

19  fall of the 2014 semester, correct?

20      A.  Yes.

21      Q.  All right, and that class began, it was a

22  Monday through Friday class, right?

23      A.  Yes.

24      Q.  Do you remember what time it started and

Deposition of Dexter Saffold - April 12, 2016

1  ended each day?

2      A.  I believe 9:00 a.m. to 12:00 noon or 11:30,

3  one of those times.  I know they cut half an hour

4  off.

5      Q.  All right.  Did you attend class on Monday,

6  September 15, the first day of class?

7      A.  Yes, I did.

8      Q.  Okay, and what time did you arrive?

9      A.  9:00 a.m.

10      Q.  Did you stay for the entire class?

11      A.  Yes.

12      Q.  Was there a sign-in sheet where you signed

13  in to indicate you were present?

14      A.  They do a roll call, and then when we get

15  ready to leave out we sign out.

16      Q.  Okay, and did you sign the sign-in sheet or

17  sign-out sheet that day?

18      A.  Yes, I did.

19      Q.  I'm going ask you about each day kind of

20  the same question, so just hang with me.  So for

21  Tuesday, September 16, 2014, the second day of

22  class, did you attend on that day?

23      A.  On the what?

24      Q.  Tuesday, the second day of class --

Deposition of Dexter Saffold - April 12, 2016

1    A.  Yes, I did.

2    Q.  -- September 16.  Okay, and what time did

3  you arrive on that day?

4    A.  9:00 a.m.

5    Q.  Did you stay for the entire class?

6    A.  Yes.

7    Q.  And again did you sign in or sign out on

8  the sheet?

9    A.  Yes, I did.

10    Q.  Same question for the third day of class,

11  Wednesday, September 17, did you attend on that

12  day?

13    A.  On the 17th, yes, I did.

14    Q.  All right, and what time did you arrive

15  that day?

16    A.  9:00 a.m.

17    Q.  Did you stay for the entire class?

18    A.  Yes.

19    Q.  And did you sign in or sign out on the

20  sheet?

21    A.  Yes, I did.

22    Q.  And how about Thursday, September 18, did

23  you attend on that day?

24    A.  Yes.

Deposition of Dexter Saffold - April 12, 2016

1      Q.  Okay.  Now the reason I'm asking is because

2   in this complaint that's in front of you it

3   states in the second paragraph, and I'm quoting

4   it now, it says:  On September 15, 16, and 17 I

5   attended classes anyway.

6            So your first amended complaint does

7   not state that you attended on the 18th, the date

8   you just said that you did.  So is your complaint

9   just wrong on that or are you wrong today?

10     A.  No, it's right.  I was there on the 17th

11  and 18th because I remember what I exactly did on

12  that day.

13     Q.  On which day?

14     A.  On the 18th and 17th and all the other

15  days, I remember exactly what happened that week.

16     Q.  Okay, did anything -- well, okay.  So how

17  about Friday, September 19, did you attend that

18  day?

19     A.  Yeah, I was there.

20     Q.  Okay.  Let's go back to Thursday,

21  September 18, what time did you arrive?

22     A.  9:00 a.m.

23     Q.  And did you stay for the entire class?

24     A.  Yes, I did.

Victoria Legal + Corporate Services
800.827.7708  www.victorialcs.com

Deposition of Dexter Saffold - April 12, 2016

1    Q.   How about Friday, September 19, what time
2  did you arrive?
3    A.   Same thing, I was there all day.
4    Q.   You arrived at 9:00 a.m.?
5    A.   Yes.
6    Q.   All right.  In the second paragraph of your
7  first amended complaint in the third sentence,
8  I'll just read it and your attorney can correct
9  me if I'm reading it wrong.
10           It says:  On the 17th I was dropped
11 from the program due to my disability.  So if you
12 were dropped from the program, why did you keep
13 attending?
14   A.   I kept attending because I was supposed to,
15 and I wanted to find out why they did not have
16 the note-taker there because on the 17th the
17 note-taker showed up late on the 17th and I was
18 there.
19   Q.   All right --
20   A.   Then when I went and talked to Ms. Gail
21 Bonds on the 18th, that's when she told me that
22 blind people or people visually impaired can't be
23 in the program because they don't have no way of
24 working with us.

Deposition of Dexter Saffold - April 12, 2016

1    Q.  Okay.  So how did you find out you were

2  dropped from the program?

3    A.  I went and talked to Ms. Patrice Burton.

4    Q.  Your complaint states that you found out

5  you were dropped on the 17th, I just read that

6  sentence.  Is that the date you found out you

7  were dropped from the class?

8    A.  Yes, um-hmm.

9    Q.  That would have been Wednesday, the third

10  day of class?

11    A.  Um-hmm, and I still stayed in there even

12  though Gail Bonds don't have the authority to

13  drop no students, so she can't drop me.  That's

14  why I stayed because normally when they drop

15  students they have them to get their stuff and go

16  to the office.  I was never told to grab your

17  stuff, you got to go to the office because of

18  this reason.

19          So Gail Bonds don't have the authority

20  to drop nobody.  She works in a different

21  department, she has no jurisdiction over who can

22  come and who can go.  So I didn't pay no

23  attention to that, what she was talking about.

24    Q.  Okay, so --

12

Deposition of Dexter Saffold - April 12, 2016

1     A.  So I went to her boss and -- which
2  Ms. Patrice Burton is her boss.
3     Q.  Okay.  So who told you you were dropped
4  from the class?
5     A.  Ms. Bonds.
6     Q.  That's Gail Bonds Carpenter?
7     A.  Yeah, and she said --
8     Q.  Okay, just wait a minute.  What date did
9  she tell you that on?
10    A.  When I went up to her office on the 18th to
11 find out why she did not have a note-taker.
12    Q.  And what day was that?
13    A.  On the 18th when I was there.  They said I
14 was not there on the 18th and I was there.
15    Q.  So on the 18th you went to Gail Bonds
16 Carpenter's office?
17    A.  Um-hmm.
18    Q.  Yes?
19    A.  Yes, sir.
20    Q.  All right, I just need you to say yes or
21 no.  Okay, and what time of day did you go there?
22    A.  I went there during the break hour that we
23 had, you know.  We got a little 15-minute break.
24 So I went upstairs, took the elevator.  It took

Deposition of Dexter Saffold - April 12, 2016

1   me a little time because I had a walker that I

2   use.  So I went up there to find out why.  And

3   the instructor knew where I was going because I

4   let him know just in case he start class after

5   the break and I don't make it back down, he'll

6   know why I'm late for class.  Because if you late

7   for class or you don't come back after your

8   break, they mark you absent.

9       Q.   Okay.  So it was sometime between after

10  9:30 but before the class ended at 11:30 that you

11  went up to see her?

12      A.   Yeah, um-hmm.

13      Q.   And this is on Thursday, the 18th, correct?

14      A.   Right.

15      Q.   So why did you go up and see her?

16      A.   To find out why the note-taker was not

17  there.

18      Q.   Oh, okay.  At what point did you find out

19  that you were dropped from the class?

20      A.   When she had told me that I was dropped.

21  And I told her, I said that you don't have

22  authority over that.  You don't have authority to

23  drop nobody.  I said I need the note-taker, are

24  you going to provide it.

Deposition of Dexter Saffold - April 12, 2016

1        Me and her went down, we had a

2  discussion.  She said blind people and students

3  visually impaired cannot be in the program.  So

4  we walked downstairs together, me and her.

5    Q.  To what destination?

6    A.  To my classroom, into the classroom that we

7  was in.  And I remember we made it down there but

8  class got out.  And --

9    Q.  Well, just let me -- may I interrupt you

10  for just a second.  So how long were you with

11  Gail Bonds Carpenter?

12    A.  I don't remember the exact time how long --

13    Q.  No, I'm not asking for exact times.  You

14  said you went during the class and then you made

15  it back down before it ended, that implies you

16  were there --

17    A.  When I said that I mean that during the

18  break hour I went up.  I let the instructor know

19  I'm going up so if he start class and I haven't

20  made it back, because if you leave and don't tell

21  him and they don't know where you at, you don't

22  make back from break on time, they can mark you

23  absent.

24    Q.  Right, you told me that.  How long is the

Deposition of Dexter Saffold - April 12, 2016

1    break?

2       A.   I think it's 15 minutes.

3       Q.   Okay, did you return back in 15 minutes to

4    class?

5       A.   No, I didn't because it took me a little

6    time because you got to catch the elevator to go

7    up, and then I had the walker that I use, so it

8    take me a little bit longer.

9            That's why I left a note in case I

10   don't make it back in time to let him know that's

11   where I'm going, to find out what happened with

12   my note-taker for that Thursday, to see where it

13   was.

14      Q.   Okay, I understand that.  Now let me ask

15   you some questions about that, okay?

16      A.   Um-hmm.

17      Q.   So Gail Bonds Carpenter returned to class

18   with you on the 18th?

19      A.   Um-hmm.

20      Q.   Why did she do that?

21      A.   Because I needed a note-taker.

22      Q.   And was she going to be the note-taker?

23      A.   Yeah, yes, um-hmm.

24      Q.   All right.  Were there any other days that

Deposition of Dexter Saffold - April 12, 2016

1   week when you didn't have the note-taker?

2      A.   Monday and Tuesday.

3      Q.   Did you complain on those days?

4      A.   Yes, I did.

5      Q.   And who did you complain to?

6      A.   First of all, Gail Bonds is usually off on

7   Mondays.  So it was somebody working in her

8   office because they tried to call her, the office

9   tried to call her, and she wasn't in.

10     Q.   Who tried to call her?

11     A.   The lady in the GED department.  They tried

12  to call Gail Bonds, Gail Bonds did not return

13  their phone call.  So after the break time I mean

14  I'm just sitting in class not doing nothing, you

15  know, falling asleep because there's nothing for

16  a person who's visually impaired to do.

17     Q.   Okay, let me just break this down a little

18  bit because this is a little different story than

19  I got from your complaint.  You're filling in a

20  lot of extra facts, okay, so let's just take it

21  one day at a time.  Was there a note-taker there

22  on Monday the first day of class?

23     A.   No, wasn't no note-taker there.

24     Q.   Okay, and so what did you do about that?

Deposition of Dexter Saffold - April 12, 2016

1    A.  I went to the front office and told them I
2  needed a note-taker.
3    Q.  Which office did you go to?
4    A.  The GED department right there on the first
5  floor.
6    Q.  Okay, and when did you go, between 9:00
7  and 11:30 you said?
8    A.  In between the classes I went and told them
9  right during the class hour that I needed a
10  note-taker and there wasn't one there, can they
11  call Ms. Bonds.  And they called Ms. Bonds up and
12  they said they couldn't get no answer.  So I said
13  I'll wait until after the break, giving her time
14  to get in.
15           And then they told me that -- give her
16  time to get in, you know, to see what happens
17  because it was on a Monday.  And then I learned
18  that she was off on a Monday, she wouldn't be in
19  today.
20    Q.  Okay, so who did you talk to on Monday?
21    A.  I asked the lady would you mind if I go up
22  to her office.
23    Q.  Okay, but do you know the person's name you
24  spoke to?

Deposition of Dexter Saffold - April 12, 2016

1    A.  It was a lady in the GED.  I don't want to

2  guess her name because I don't remember the name.

3    Q.  Okay, a woman in the GED office?

4    A.  Yeah.  I really hate to put down the wrong

5  name and be wrong.  I don't want to be -- you all

6  beat me up for it, you know.  But I did talk to

7  someone in the GED department, I said I'm going

8  to go up and see Ms. Bonds, she say she wasn't

9  answering her phone, I say okay.  Then she said I

10  believe she off today, so I went up there to see

11  for myself.

12    Q.  Okay, so you left the classroom, you first

13  went to the GED department, and then you got that

14  information, and then you went up to Gail Bonds

15  Carpenter's office --

16    A.  And then I --

17    Q.  Yes?

18    A.  Yeah, and then --

19    Q.  You have to let me finish talking.

20    MR. HOFELD:  Yes, you can't talk over him,

21  you have to wait until he's done.

22  BY MR. CANNON:

23    Q.  Just wait for me.  I know you're anxious to

24  tell me things, but we just have to slow it down

Deposition of Dexter Saffold - April 12, 2016

1   a little bit so we can get the information that
2   you're trying to give me, okay?
3       A.   Okay.
4       Q.   So you left the class on Monday and you
5   went to see a woman in the GED office, found out
6   that Gail Bonds Carpenter was not at work, and
7   then you went up to Ms. Carpenter's office?
8       A.   They instructed me that she believes
9   Ms. Bonds may be off because she has not returned
10  her call.  So when I got my break, the only time
11  I could go was when I got a break, so I informed
12  the instructor I'm going upstairs once I get my
13  break, so if I don't make it back in 15 minutes
14  they won't lock you out from the room because
15  they only give you 15 minutes.
16              So I said well, I'm going up here and
17  just see where Gail Bonds is because I asked the
18  lady, I said did you talk to her.  She said she
19  didn't answer her phone, I think she's off today.
20  And I said well, I'm going to go up there and see
21  anyway.
22              So I got my 15-minute break, then I
23  went upstairs to see if she was in and to see
24  where was the note-taker.

Deposition of Dexter Saffold - April 12, 2016

1    Q.  Was she in?

2    A.  No, she was not.  It was a lady sitting at

3    the desk, her secretary or another lady that

4    works in the office.

5    Q.  All right, okay --

6    A.  I don't know if she's a secretary or if she

7    just work in the office.

8    Q.  Were you provided a note-taker on Monday?

9    A.  No, I was not.

10   Q.  Okay.  Now I just need to backtrack a

11   little bit, I'm a little confused.  You just said

12   that you went up to Gail Bonds Carpenter's office

13   on Monday during your break and you described

14   that as a 15-minute break.  At what point in the

15   class did you go to the GED office?

16   A.  Okay, when they gave us our break, during

17   the whole time after my break as I go past the

18   hallway I asked the lady going out to the break

19   area, because usually I have a walker so usually

20   I'm the first one.

21            So the office is right there and I

22   asked the lady did you talk to Gail Bonds.  She

23   said no, I believe she's off today.  And I said

24   well, I'm going to go up there and see what

Deposition of Dexter Saffold - April 12, 2016

1   happened to the note-taker and see what's up.

2   And she said --

3       Q.  So this entire travel that you're talking

4   about with the GED woman and --

5       A.  Um-hmm, and she said --

6       Q.  Let me finish -- and Gail Bonds Carpenter's

7   office all took place during this 15-minute

8   break?

9       A.  Yes, um-hmm.

10      Q.  Okay, thank you.  So you never had a

11  note-taker on Monday, correct?

12      A.  Right.

13      Q.  Did you have a note-taker on Tuesday?

14      A.  No, I did not.

15      Q.  And did you complain to anyone on Tuesday

16  that you didn't have a note-taker?

17      A.  Yes, I did.

18      Q.  Who did you complain to?

19      A.  To the people in her office.

20      Q.  Was it the same scenario you just

21  described?

22      A.  Yeah.

23      Q.  Okay, was Gail Bonds Carpenter at work that

24  day?

Deposition of Dexter Saffold - April 12, 2016

1      A.  I don't remember.

2      Q.  So did you attempt to see her or go to her

3  office on Tuesday?

4      A.  I don't think I did, no, no.  I think what

5  happened was someone from the office came in and

6  sat there and took the notes for me from the GED

7  department.  Sometimes they do do that.

8          If they're not too busy they'll come in

9  because they have done it for me before.  Because

10  they don't get no student to do it because the

11  student can't do it, so they'll come in there

12  and, you know, take them for me.  That's what I

13  do remember about that Tuesday.

14      Q.  So someone did pitch in on Tuesday and act

15  as your note-taker?

16      A.  Yes, um-hmm.

17      Q.  Do you know that person's name?

18      A.  No.  In fact I --

19      Q.  Did you get notes from that person?

20      A.  Yes, I did.

21      Q.  Do you have those notes?

22      A.  I think I do.  I'd have to look it up, I

23  don't remember.

24      Q.  All right, so if -- not right now, but at

Deposition of Dexter Saffold - April 12, 2016

1    sometime in the future I ask your attorney to try

2    to get those from you, will you give it a try?

3        A.  I'll see because I had a fire and I've

4    moved since then.

5        Q.  All right, but you'll try if we need them,

6    you'll try to find them?

7        A.  I can try to find them, yeah.

8        Q.  Okay --

9        A.  I had a fire and I moved since then.

10       Q.  All right.  But on Monday you never had a

11   note-taker for the entire class; is that what

12   you're telling us?

13       A.  Exactly.

14       Q.  Okay.  And then on Wednesday again you did

15   not have a note-taker?

16       A.  No, the note-taker showed up late on

17   Wednesday.

18       Q.  And did you get notes from the note-taker

19   for Wednesday?

20       A.  She showed up late and I got whatever she

21   took, she wrote down.

22       Q.  Do you know that person's name?

23       A.  No, I do not, first time I had ever met

24   her.

Deposition of Dexter Saffold - April 12, 2016

1    Q.   Do the note-takers put their names on the

2    notes?

3    A.   They have a sign-in sheet that I sign my

4    name and the note-taker got to sign theirs,

5    because if I don't sign and they don't sign, they

6    don't get paid.  That's how that works.  And then

7    they have the instructor, the teacher to initial

8    it for them as well.

9    Q.   All right.  Now let's move to Thursday

10   again, September 18.  So you know who Patrice

11   Burton is, you've mentioned her?

12   A.   She's the dean of students, student

13   services.

14   Q.   So she would be Gail Bonds Carpenter's

15   boss, right?

16   A.   Exactly.

17   Q.   Okay.  So did you see Ms. Patrice Burton on

18   Thursday the 18th?

19   A.   I went to see Gail Bonds again when the

20   note-taker was not there.

21   Q.   Okay, again?

22   A.   Right, and I went and told her exactly what

23   she told me.

24   Q.   You told who exactly what who told you?

Deposition of Dexter Saffold - April 12, 2016

1    A.   What Gail Bonds told me about having a
2  note-taker.  I said you told me let you know two,
3  three weeks in advance when I need a note-taker
4  to give you time to have one.  Here it is two to
5  three weeks in school, I gave you two to three
6  weeks notice that I'm coming back and these are
7  the classes that I'm doing, where is the
8  note-taker.
9    Q.   Okay, now you're talking about the fall
10 2014 semester?
11    A.   Exactly, and that's when --
12    Q.   You're sure you're not talking about a
13 different semester here?
14    A.   No.
15    Q.   Okay.  Do you recall --
16    A.   Let me say this, may I?
17    Q.   Well, I guess you can talk.  I prefer to
18 ask questions and get answers, but...
19    A.   Well, you're the boss, you can go ahead.
20    Q.   All right.  Do you recall in a different
21 semester other than the fall of 2014 signing a
22 document that stated that you failed to advise
23 the college three weeks in advance that you
24 needed a note-taker?

Deposition of Dexter Saffold - April 12, 2016

1      A.  Yes, yes, I did, yes, and I didn't let them

2  know in time, yes.

3      Q.  Okay.  So again on Thursday there's no

4  note-taker, correct?

5      A.  Um-hmm.

6      Q.  Yes?

7      A.  Yes, no note-taker.

8      Q.  All right.  So you went to see -- who did

9  you see first, Patrice Burton or Gail Bonds

10  Carpenter?

11      A.  I went to see Gail Bonds Carpenter.

12      Q.  Okay, and was there anybody else present

13  when you were with her?

14      A.  I was the only one in the office, but there

15  was a lady outside her desk that works with her.

16  It was a secretary or someone that works with her

17  that was outside in the office, I don't know if

18  she heard the conversation.

19      Q.  Right, okay.  So at what time -- was this

20  during the class time between 9:00 and 11:30 that

21  you saw Gail Bonds Carpenter?

22      A.  It was during my break time, so it was

23  around in that time area.

24      Q.  All right.  And how long did you spend with

Deposition of Dexter Saffold - April 12, 2016

1  Gail Bonds Carpenter at that time?

2    A.  I think we spent maybe 15 minutes, 15,

3  somewhere around.  I don't recall the exact time

4  how many minutes we spent, but I was getting on

5  her about having the note-taker.

6            I said before you told me I had to give

7  you three weeks notice for a note-taker and

8  that -- I gave you three weeks notice and now I

9  still -- here it is the school day, I still don't

10  have a note-taker.  And by me sitting up in class

11  not doing nothing but, you know, going off to

12  sleep, what you want me to do.

13            She said well, the main thing she said,

14  students cannot -- she said students visually

15  impaired cannot have a note-taker because they

16  don't know how -- these are students, they don't

17  know how to work with people that's visually

18  impaired or blind.

19            That's when she told me about how the

20  government has certain people that they work with

21  that come in, like they work with handicapped

22  people that have a speech impairment.  They have

23  certain people that have certain handicaps that

24  the government brings in to work with them.  But

Deposition of Dexter Saffold - April 12, 2016

1    they don't work with -- they don't have that for

2    people that's visually impaired or blind, so you

3    really can't be in the program because we got

4    students that's doing this.

5        Q.   All right, let me try to sort this out a

6    little bit.  Do you know what an academic

7    passport is?

8        A.   Yes.

9        Q.   So you attended South Suburban College over

10   several different semesters, right?

11       A.   Yes.

12       Q.   And didn't you have an academic passport

13   each semester?

14       A.   Yes.

15       Q.   And didn't the academic passport provide as

16   one of your accommodations that you would have a

17   note-taker?

18       A.   Yes, it did.

19       Q.   Okay, and leaving aside the fact whether

20   they were late or someone had to substitute in,

21   didn't the college in fact provide a note-taker

22   for you during the time you were supposed to have

23   one?

24       A.   Sometimes --

Deposition of Dexter Saffold - April 12, 2016

1      MR. HOFELD:  Are we talking 2014 or before?

2      MR. CANNON:  Just anytime.

3      MR. HOFELD:  Well, he said about 15 times

4   there was no note-taker on a number of days, so

5   I'm just trying to clarify when you're talking

6   about.

7      MR. CANNON:  I'm just trying to get him to

8   answer, Brian, whether he ever had a note-taker

9   given to him by the college when he attended

10  there.

11     MR. HOFELD:  Well, you've already talked

12  about 2014, so I mean if you're going over it

13  again, it's --

14     MR. CANNON:  I just want to know if he ever

15  had.

16     MR. HOFELD:  -- it's an indirect way of

17  doing it, but go ahead, do whatever.

18  BY MR. CANNON:

19     Q.  Did you ever have a note-taker provided for

20  you by the college?

21     A.  Sometimes I had a note-taker, sometimes I

22  didn't.  Sometimes they showed up, sometimes they

23  didn't.

24     Q.  Right, okay, so sometimes you did, right?

Deposition of Dexter Saffold - April 12, 2016

1     A.   And sometime I didn't.  Not every single

2   time because sometimes if the weather was bad,

3   sometimes note-takers like me run late.  If the

4   weather -- because I remember one day when it

5   snowed and they said it wasn't no school and none

6   of the colleges were not open, it was a snow

7   storm, wasn't no colleges open and the City of

8   Chicago was closed, all of them was closed, the

9   weather was too bad, so nobody showed up.

10    Q.   Okay, so let me go back to you finding out

11  you were dropped from the class.  Who was the

12  first person who told you that?

13    A.   Gail Bonds.

14    Q.   When you saw her on that Thursday?

15    A.   Yeah, she said we dropped you because we

16  can't work with you.

17    Q.   And the reason she gave was because

18  visually impaired people can't have a note-taker;

19  is that it?

20    A.   Yeah, blind people because they don't have

21  no way of working with them because these are

22  students who go to college for extra -- you know,

23  they're on that work study program, they just go

24  to school and they get money to go to school, and

Deposition of Dexter Saffold - April 12, 2016

1   she said they don't...

2      Q.  Well, let me ask you this.  Does a

3   note-taker do anything other than take notes?

4      A.  The note-taker is my eyes.  When the

5   instructor gives me something to do, like if he

6   say write this down, she writes it down for me.

7            If we're doing a book assignment and

8   you want me to write, like say it's an essay, I'm

9   telling her my thoughts about the essay and I'll

10  start it off, that's all she's doing is write the

11  heading of it, what I tell her to do and that's

12  it.  It's all my thoughts, she's just writing

13  down what I'm saying, that's what the note-taker

14  does.

15     Q.  Didn't you have an accommodation that

16  allowed you to do homework after or outside of

17  class?

18     A.  We don't get homework in the GED program

19  unless you want to do it because the work that

20  you do, it's not like you all was in college.

21  Nobody never --

22     Q.  Let me reword my question.  When you got

23  assignments in class, forget the word homework,

24  that was a bad choice of words.

Deposition of Dexter Saffold - April 12, 2016

1              When you got an assignment in class,
2      didn't you have an accommodation that allowed you
3      to do that assignment outside of class rather
4      than in class?

5      A.   It was outside -- if it was like a book
6      report that we had to do, an assignment, we'll
7      go -- and it was going to take me some time to
8      get through with it, we will schedule and go into
9      one of the quiet rooms at the library at South
10     Suburban and use that.

11             If the quiet room was not available,
12     they got a quiet room upstairs so I can talk, I'm
13     not disturbing anybody.  I use that on the
14     majority of the time and sometimes I have to sign
15     out for it and they'll say maybe you got an hour
16     for the quiet room, maybe you got an hour and
17     forty-five minutes because there's always someone
18     behind you waiting to use the quiet room.

19     Q.   Okay.  So is that a yes, you were allowed
20     to do assignments outside of the classroom?

21     A.   If they gave it to us, yes.  Yeah, they
22     have to do that because I got to do the talking,
23     you know.

24     Q.   All right.  You went back to the classroom

Deposition of Dexter Saffold - April 12, 2016

1   now on Thursday with Gail Bonds Carpenter, tell

2   me what happened then?

3     A.  I went back to the classroom with Gail

4   Bonds Carpenter, her and the teacher had a debate

5   because I guess -- the lady I talked to had told

6   her where's our note-taker, and she said well,

7   the note-taker didn't show up for some reason,

8   the note-taker did not show up.

9            And she said well --

10    Q.  Who is she?

11    A.  Gail Bonds said the lady --

12    Q.  Who is she talking to?

13    A.  She's talking to one of her people in the

14   GED department.

15    Q.  And you're with her now?

16    A.  Right, and then --

17    Q.  This is before you went back into the

18   class?

19    A.  She came down with me, yes.

20    Q.  So first you went to the GED office?

21    A.  What I said was I went up there to see

22   Gail Bonds.  I told the lady so they can know

23   where I'm going --

24    Q.  Yes, I'm with you on that.  Now you leave

Deposition of Dexter Saffold - April 12, 2016

1   Gail --

2       A.   Gail, she came down --

3       Q.   No, just let me finish my question please.

4       A.   Okay.

5       Q.   When you left Gail's office with Gail,

6   where did you go?

7       A.   We went back to the GED department

8   together.

9       Q.   Okay, so you went there before you went

10  back to the class?

11      A.   Right.

12      Q.   And what happened at the GED department?

13      A.   Let me say this here.  The GED department

14  is here and the class is here (indicating).  I

15  don't know if I can make --

16      Q.   All right, so they're close together?

17      A.   Yeah, they're close together, so you're

18  going to pass the GED department going to the

19  class.

20      Q.   Okay.  So what happened in the GED

21  department?

22      A.   We were in the hall coming in, and the lady

23  in the GED department asked her what happened to

24  his note-taker, you know, and she came back and

Deposition of Dexter Saffold - April 12, 2016

1    said well, I'm not a note-taker, I assign

2    note-takers.  So she came in and --

3         Q.   Into the classroom?

4         A.   Into the classroom with me, she walked

5    right past me, sat in the back of the class, sat

6    in the back of the class.

7              And the instructor, Mr. Smith, told me

8    to write down -- I got five definitions on the

9    board, I need you all to write it down and give

10   me five sentences out of those five definitions.

11   And I said okay, fine, I'll do that.  But he

12   asked me, he said Mr. Saffold, where's your work,

13   and I said Ms. Bonds, she's working it, and she

14   ain't writing down nothing, she didn't do

15   nothing.

16        Q.   Okay.

17        A.   I said okay, and I asked her, she said she

18   didn't do anything, she only wrote the five

19   definitions down, but she didn't make the

20   sentences out of them.  And I said well, what the

21   hell do I need with you if you're not going to do

22   anything.  That's what I told her.

23        Q.   So you return, now you're back in the

24   classroom after the break, Gail Bonds Carpenter

Deposition of Dexter Saffold - April 12, 2016

1    is sitting in the back of the classroom but I

2    guess not taking notes, now what happens when the

3    class ends?

4        A.   The class ended, because I remember

5    Ms. White said something, she said why is she

6    even down there if she's not assisting.  And I

7    said I don't know, but I'm going to fix this here

8    problem.  And Gail Bonds went out before me, she

9    met me at the other end of the hall.

10       Q.   After class?

11       A.   Right, as we go out to the parking lot on

12   the other side of security she's going to ask me

13   well, what is your disability.  I said why you

14   want to know what my disability is, you got all

15   the doctor statements that I gave you, you got

16   every single doctor statement that I gave you,

17   from the University of Chicago, you got them all,

18   from the Chicago Lighthouse, you got all the

19   medical.

20            Why you want to know my disability for,

21   you ain't doing nothing for me, you're not

22   assisting me with anything.  Then you say I was

23   dropped, so I say fine, I'm dropped, forget it,

24   I'm going to go tell -- I'm going to go see your

Deposition of Dexter Saffold - April 12, 2016

1   superior.

2     Q.  Is that when you went to see Ms. Patrice

3  Burton?

4     A.  Yes, that Friday after class, yeah.

5     Q.  Well, we're still on Thursday.  You tell

6  me, was it Thursday or Friday?

7     A.  Well, once I saw -- once me and Ms. Bonds,

8  I was through talking with her, I went on and

9  said, you know, come back the next day and see

10  Patrice Burton.

11     Q.  Okay, so after you had this conversation

12  after class on Thursday with Gail did you leave

13  the building or did you do something else?

14     A.  That's when I met -- that's when Gail Bonds

15  was at the elevator at the end of the hallway

16  when I was leaving out the building asking me

17  what is my disability.

18     Q.  No, no, no, we've already talked about

19  that.  What did you do after that?

20     A.  After that I got in my ride and went home.

21     Q.  Okay, so you went home.  And then you came

22  back to class on Friday?

23     A.  Yeah, um-hmm.

24     Q.  And is that the day that you met with

Deposition of Dexter Saffold - April 12, 2016

1  Patrice Burton?

2     A.  Yeah, after class, yeah, because I recall

3  she was in a meeting.

4     Q.  How did you meet with her, did you go to

5  her office?

6     A.  I went to her office.

7     Q.  And did she see you, did you meet with her?

8     A.  Yeah, we met for over an hour.

9     Q.  Okay, so you were with her for over an

10 hour?

11    A.  Um-hmm.

12    Q.  Was there anyone else present?

13    A.  No.

14    Q.  What did you say to her and what did she

15 say to you?

16    A.  I said first of all, Gail Bonds -- or no,

17 sorry, Patrice Burton.  I said Ms. Bonds told me

18 I was dropped from the program, I said she don't

19 have no authority to drop nobody from nothing.

20    Q.  Can I just interrupt you for a second, and

21 I might do this because I sense you're going to

22 give a long answer, so excuse me.  Who does have

23 the authority to drop you from a class?

24    A.  The school does, the dean, the dean of the

Deposition of Dexter Saffold - April 12, 2016

1    department, whoever is over the head of that

2    department, they have authority.

3        Q.   So the GED department, the head of that

4    department has a right to drop you?

5        A.   Unless you're in some trouble with security

6    and you don't have no authority to be at that

7    school or you're doing something foolish, some

8    foolishness --

9        Q.   Right, but I'm not concerned about that.  I

10   don't think that you were engaging in that stuff.

11   But let's get back now to what you told -- your

12   conversation with Patrice Burton, what did you

13   say to her and what did she say to you?

14       A.   I said Ms. Gail Bonds is telling me I was

15   dropped from the program and she did not provide

16   me a note-taker.  And we went on, and I said

17   well, she did on Thursday, she come downstairs.

18   I said if I'm dropped why would she come

19   downstairs, go to the back of the class, write

20   notes in the back of the class and not assist me.

21            How am I supposed to communicate with

22   her if she goes to the back of the class, how is

23   she going to write down five definitions if she's

24   sitting in the back of the class and I'm in the

Deposition of Dexter Saffold - April 12, 2016

1    front of the class.

2        Q.   And what did Ms. Burton say?

3        A.   She said well, normally the students don't

4    sit side by side with their note-taker, and I

5    said how you supposed to talk to each other, by

6    airplane, e-mail, what you want me to do, how I'm

7    supposed to communicate.

8        Q.   So let me go back to this question again

9    now.  And I sort of asked this before and you

10   have to excuse me, I'm not quite following you.

11            The word note-taker seems to describe a

12   person who takes notes, but you seem to be

13   describing a note-taker as someone who sits next

14   to you and talks to you.  Is that your --

15       A.   They're the same thing --

16       Q.   Wait, let me finish.  Is that your

17   understanding of what a note-taker does, they sit

18   next to you and talks to you?

19       A.   No.  A note-taker sits -- a note-taker is

20   just like he doing, sitting here taking notes,

21   writing down what I'm saying.  Just like your

22   court reporter, instead of using a device, they

23   are using -- they're taking notes, they're

24   sitting down writing notes.

Deposition of Dexter Saffold - April 12, 2016

1            And when I say notes, that means that
2    if the instructor asks me to write five
3    definitions down, she's writing my five
4    definitions down.  If she -- if the instructor --
5      Q.  Wait, wait, let me interrupt you now.
6    Would the note-taker write down:  Please write
7    down five definitions, or would the note-taker
8    write down what you say are five definitions?
9      A.  The note-taker would write down my five
10   definitions --
11     Q.  And how --
12     A.  -- if he's asking me to form them in a
13   sentence, the note-taker would put them in a
14   sentence for me using my thoughts.
15     Q.  So the note-taker is putting down on paper
16   your answers to the assignment?
17     A.  Yes.
18     Q.  Okay, so you're talking to the note-taker?
19     A.  Can I give you an example?
20     Q.  No, just answer my question.  So you're
21   talking to the note-taker?
22     A.  Yes.
23     Q.  And telling her what the five definitions
24   are?

Deposition of Dexter Saffold - April 12, 2016

1    A.  No, they up on the board already.

2    Q.  Oh, okay.  So what was this five definition

3  assignment, they're on the board, what were you

4  supposed to do with them?

5    A.  Write the five definitions on the board,

6  after he write -- he told us to write down the

7  five definitions.  I wrote down the -- she wrote

8  down the five definitions for me.

9    Q.  The note-taker did?

10    A.  Right, and then make sentences out of those

11  five definitions.

12    Q.  All right.  So that was the assignment, to

13  make sentences out of them?

14    A.  Out of five of them, yeah, and we only had

15  so much time to do it, yes.

16    Q.  Okay.  So is that the kind of assignment

17  that you're allowed to do outside of class if you

18  needed to?

19    A.  No, you're inside the classroom.

20    Q.  I know you're inside the classroom, but

21  remember we just talked about one of your

22  accommodations is you can do assignments outside

23  of the classroom?

24    A.  No, this was a job that was supposed to be

Deposition of Dexter Saffold - April 12, 2016

1  done inside the classroom because we were

2  expected to do it before we leave.

3      Q.  Okay, so how did you accomplish that

4  assignment?

5      A.  Gail Bonds, she didn't do it.

6      Q.  So the five definition assignment was on

7  the Thursday when Gail Bonds was sitting there?

8      A.  Um-hmm.

9      Q.  Yes?

10      A.  Yes.

11      Q.  Okay, all right.  So how did you attempt to

12  accomplish that assignment that day?

13      A.  It never got completed.

14      Q.  Right, I know that, but Gail Bonds

15  Carpenter was sitting in the back of the room,

16  you were not sitting next to her, right?

17      A.  Right, I was in the front.

18      Q.  So what did you do to try to finish the

19  assignment?

20      A.  It never got finished.  It was time to go

21  and then it wasn't no need.

22      Q.  No, I'm not asking you if it was finished

23  or not, we know it wasn't.  I'm asking you you've

24  got the assignment now, what did you do to try to

Deposition of Dexter Saffold - April 12, 2016

1  do the assignment?

2      A.  We never finished the assignment because

3  she was sitting in the back of the class, I was

4  sitting in the front of the class, and she wasn't

5  moving and I wasn't moving, so it wasn't nothing

6  we could do.

7      Q.  So usually note-takers sit right next to

8  you; is that what you're saying?

9      A.  Right, because how you going to communicate

10  with them?  And I --

11      Q.  That's a note-taker's job, to sit next to

12  you and communicate with you?

13      A.  Right, because how they going to know to

14  write down my sentences?  What we supposed to do,

15  holler to each other, hey, they got the word run,

16  make a sentence out of the word run, okay, hey,

17  note-taker, this is the sentence.  I'm supposed

18  to holler to the back of the class?

19      Q.  Okay, let me just --

20      A.  I was just giving you an example.

21      Q.  -- let me shift back.  I'm not talking

22  about the fall of 2014 now.  How many other

23  semesters did you attend South Suburban College?

24      A.  I have to count it.  I attended -- I know

Deposition of Dexter Saffold - April 12, 2016

1    2012 was when I started, then I went 2012, then I

2    went 2013, January 2013, I went the summer, then

3    I went -- I remember stopping, I didn't go back

4    in the fall.  I dropped the fall of '13, the fall

5    semester of '13 I dropped it because I was

6    waiting to get some devices on my own.

7        Q.  So at least two or three other semesters

8    then?

9        A.  Um-hmm.

10       Q.  Other than the fall of 2014?

11       A.  2012 fall semester which started in

12   September, 2013 January, and the summer of 2013.

13       Q.  Okay, so during those semesters you had a

14   note-taker, correct?

15       A.  Yes.

16       Q.  And during those semesters did you sit next

17   to your note-taker and talk to your note-taker in

18   order to complete assignments?

19       A.  Okay, should I use talk or should I say

20   communicate with them?  Either way, talking and

21   communication is the same thing.

22       Q.  What do you mean by communicate if it's not

23   talking?

24       A.  Well, that's what they was asking on some

Deposition of Dexter Saffold - April 12, 2016

1   of the questions that they would give you,

2   there's communication and talking, A, are they

3   the same.

4       Q.  Okay, let's break it down --

5       A.  That's just what they would ask you on the

6   board.

7       Q.  I'm not concerned with that.  I'm not

8   trying to trick you.  Did you talk to your

9   note-taker during those other semesters during

10  class?

11      A.  We communicated with each other because I

12  have to tell her what my thoughts are so she can

13  write them down.  If it's a math subject, it's no

14  reading in math, so I have to tell her what my

15  answers are in a math question.

16      Q.  And do you tell her that verbally, out

17  loud?

18      A.  Yeah.

19      Q.  Okay, so that's talking, right?

20      A.  It would be a short -- as long as it's

21  something short.

22      Q.  Yeah, I'm not concerned with how long it

23  is.  So you're talking to your note-taker in

24  order to do the assignment?

Deposition of Dexter Saffold - April 12, 2016

1    A.  Right, that's what I mean communicating
2  and talking, right, I'm talking.
3    Q.  Okay.  So are you saying that that changed
4  in the fall of 2014, that it was no longer
5  allowed for you to talk to your note-taker?
6    A.  Well, according to Ms. Gail Bonds that's
7  what she's saying, and that's what she did when
8  she came downstairs and she walked right past me.
9    Q.  All right.  Did you ask, and I'm going back
10  to Patrice Burton now.  You're talking to Patrice
11  Burton, did you ask her for something, for some
12  accommodation or for her to do something for you?
13    A.  No, because they got doctor statements that
14  tell them what they need to do and how they need
15  to do it, so it wasn't for me to give them the
16  information because they got it from the doctor.
17          I don't know if you read the doctor's
18  report, but they got it from the doctor.  The
19  doctor told them what they needed to do, provide
20  me with large print and stuff like that.  Provide
21  someone that can read the answers to him and that
22  way -- read the information to him, like that.
23          That's what the note-taker does, they
24  read it, you know, the information to you

Deposition of Dexter Saffold - April 12, 2016

1    sometimes --

2        Q.  Okay, so --

3        A.  -- and then they write down what you're

4    saying.

5        Q.  After you left her that day did Ms. Burton

6    schedule a meeting with you, Ms. Burton, and Gail

7    Bonds Carpenter for that coming Monday?

8        A.  Yes, she did.

9        Q.  Did you attend that meeting?

10       A.  No, because I said what was the use for.  I

11   got sick and tired of her giving me the

12   run-around, Gail Bonds and Patrice Burton jumping

13   all around and giving me the run-around about the

14   subject when we had already talked about it.  I

15   just said forget it, I'll just take it to -- file

16   a case in court and let them deal with it.  Which

17   I was not required -- I'm not required to meet

18   with them if I chose not to.

19       Q.  Okay.  Now forgive me if I didn't quite get

20   this clear.  You attended class on Friday the

21   18th as well; is that your testimony?

22       A.  Yeah, I was there, yes.

23       Q.  Did you have a note-taker that day?

24       A.  I don't remember offhand.  I don't

Deposition of Dexter Saffold - April 12, 2016

1    remember.  I thought I did, I just don't remember
2    offhand.
3        Q.  Did anyone ever tell you that you were
4    dropped from the class because you were absent?
5        A.  No.
6        Q.  Are you familiar with -- have you ever
7    heard of a rule in adult education or GED that
8    during the first two weeks of class if you have
9    two or more absences you're dropped from the
10   class?
11       A.  I heard of that in 2012, yes.
12       Q.  Okay.  Did anybody ever tell you that that
13   rule changed after 2012?
14       A.  No.
15       Q.  Did you ever receive a document in the fall
16   of -- strike that question.
17               In your complaint you state that you
18   registered for class on September 8, 2014?
19       A.  September 18?
20       Q.  September 8, which would have been a week
21   before class started?
22       A.  Right.
23       Q.  Did you take some type of assessment test
24   that day on September 8 when you registered?

Deposition of Dexter Saffold - April 12, 2016

1    A.  Yes, I did.

2    Q.  Okay, and where did you take that?

3    A.  We went into a quiet room in the area of

4    the library and took it.

5    Q.  Okay, who was with you?

6    A.  Mr. Beasley.

7    Q.  Would that be Matt Beaslund (phonetic)?

8    A.  I'm not sure sure of his first name, I just

9    know Beasley or something like that.

10   Q.  He works in the GED department?

11   A.  Exactly.

12   Q.  Okay.  So you took your assessment test,

13   right?

14   A.  Yes.

15   Q.  And did Mr. Beaslund give you a document

16   that stated the date and time of the class and a

17   bunch of other things?

18   A.  No, because that's worked out between me

19   and them.

20   Q.  You didn't receive a document that's called

21   registration-orientation rules?

22   A.  No, only a registration card.

23   Q.  Okay.  You said a couple of times that

24   Gail Bonds Carpenter told you, and correct me if

Deposition of Dexter Saffold - April 12, 2016

1    I'm wrong, that visually impaired student cannot

2    attend GED classes?

3        A.  Right.

4        Q.  But you had in fact attended GED classes

5    before the fall of 2014 as a visually impaired

6    person, right?

7        A.  Well, Ms. --

8        Q.  Yes or no?

9        A.  Yes.

10       Q.  Okay.  So something changed in the fall

11   of 2014, is that what you're telling me?

12       A.  Yes, because Gail Bonds was not there at

13   the time.

14           MR. HOFELD:  Before 2014?

15           THE WITNESS:  Yes, before, she was not

16   there.  She just came on board somewhere

17   around -- I don't know the exact day when she

18   started, but she wasn't there when I started

19   going there.

20   BY MR. CANNON:

21       Q.  So she wasn't there in 2013?

22       A.  Not that I recall.  I think she came like

23   maybe the fall of 2013, somewhere around there.

24   I don't know exactly when she started.

Deposition of Dexter Saffold - April 12, 2016

1    Q.   Okay, so --

2    A.   I know she wasn't there in 2012, I do know

3    that.   It was another lady that was there that

4    was in charge of it.

5    Q.   Okay, thank you.

6    A.   And she spoke with an accent and she spoke

7    real soft.   I don't think she was from this

8    country, but she spoke real soft.   It was hard to

9    really understand her English.

10    Q.   So in your first amended complaint you

11    state that you were denied services, what service

12    specifically did you want that you were denied?

13    A.   The note-taker.

14    Q.   Okay, but your passport says that you can

15    have a note-taker?

16    A.   The passport can say a lot of things, but

17    Ms. Bonds took it away.

18    Q.   Okay, even though --

19    A.   She the one who makes the passports, she

20    the one puts it together.

21    Q.   So your testimony is that your passport

22    said you could have a note-taker, and in fact you

23    had a note-taker at least one day during the week

24    of the fall of 2014, but that you were denied a

Deposition of Dexter Saffold - April 12, 2016

1  note-taker, and that's why you filed this

2  lawsuit?

3      A.  Right, she told me that -- I'm not so much

4  because of the note-taker, because she said

5  visually impaired people and blind students

6  cannot be in the GED program because students are

7  students and they don't know how to work with

8  you, and because they don't know how, you can't

9  have it.

10     Q.  Okay --

11     A.  And I guess it wasn't her call to make,

12  so...

13     Q.  Whose call was it?

14     A.  I don't know.  I'm just guessing,

15  speculating.

16     Q.  So during that one week of class in the

17  fall of -- well, before I ask that question.  So

18  after Friday of the first week of class, which

19  would have been September 19, did you ever return

20  to the class again?

21     A.  After the 19th that Friday, no, I did not.

22  Ms. Patrice Burton was going to schedule a

23  meeting on the 22nd, I did not.

24     Q.  Okay, so you didn't go to the meeting and

Deposition of Dexter Saffold - April 12, 2016

1   you did not return to the class, right?

2       A.   No.

3       Q.   All right.   During that week when you were

4   there from the 15th to the 19th of September did

5   you ever have any other conversations with Gail

6   Bonds Carpenter other than the one you already

7   told me about on the 18th when she ended up

8   coming back to the class with you?

9       A.   I didn't have no more conversations with

10  her.

11      Q.   So that was the one time then that week?

12      A.   Yeah, um-hmm.   And the only thing I do

13  remember about the one conversation with

14  Ms. Patrice Burton, she wanted my records from

15  her, and she got to bring them down, had to bring

16  the files down to her office.

17      Q.   I'm just reviewing for a moment because the

18  way depositions go is sometimes you've answered

19  questions I wanted to ask you later in my notes,

20  so I'm just striking off the ones that you've

21  already answered and I'm going on to where I find

22  something else.   So just bear with me a minute.

23                  Did anyone --

24      A.   May I ask him a question?

Deposition of Dexter Saffold - April 12, 2016

1        MR. HOFELD:  We can take a quick break.

2                    (Whereupon a short break was

3                         taken.)

4    BY MR. CANNON:

5        Q.  All right, back on the record please.   In

6    the fall semester of 2014 did anyone at the

7    college ever talk to you about a personal

8    assistant?

9        A.  No.

10       Q.  Do you know what a personal assistant is?

11       A.  I have to say no.

12       Q.  On the last page of Exhibit 1, if you wold

13   just turn to the last page, and again your

14   attorney can correct me if I'm wrong, this is

15   Page 4 of 4 of Document No. 12, your first

16   amended complaint in the lawsuit.

17               It's on the letterhead of the

18   University of Chicago Section of Ophthalmology

19   dated 10/8/2014, and it's electronically signed

20   by a doctor, and I'll just spell the last name,

21   S-h-u-k-l-a.

22               And the first sentence says:  This is

23   to advise you -- and I'm quoting -- that Dexter

24   Saffold was evaluated in the clinic on 10/8/2014.

Deposition of Dexter Saffold - April 12, 2016

1  Did you in fact go to the University of Chicago

2  Hospital on that day?

3      A.  Yeah, um-hmm.

4      Q.  Did you meet with Dr. Shukla, the name I

5  just spelled?

6      A.  I don't recall his name, but I met with

7  several doctors there at that time.

8      Q.  After the meeting the doctor issued this

9  letter to whom it may concern; is that correct?

10     A.  Yes.

11     Q.  Did you ever show this letter to anyone at

12 South Suburban College?

13     A.  Yes.

14     Q.  And when did you do that?

15     A.  Once the letter was available and they sent

16 it to me by mail, then I took it up to the

17 school.

18     Q.  So you personally went with this letter to

19 South Suburban College?

20     A.  Um-hmm.

21     Q.  Yes?

22     A.  Yes.

23     Q.  What day did you go?

24     A.  I don't remember the exact date, but I do

Deposition of Dexter Saffold - April 12, 2016

1   know I wasn't going there no more, and -- I

2   wasn't going there no more, but I did deliver the

3   letter there anyway because I was thinking about

4   coming back.

5       Q.   Who did you give the letter to?

6       A.   I gave it to Gail Bonds in her office.

7       Q.   So you personally saw her and personally

8   handed her a copy of this letter?

9       A.   Yeah, um-hmm, I remember I said I was

10  thinking about coming back because I was going go

11  attend while my case is getting approved.  I was

12  going to court because I filed for certain, you

13  know, for an attorney and, you know, a fee

14  waiver, so I said I'm just going to wait and see

15  what happens.

16      Q.   Right, so at that time --

17      A.   I was going to go.

18      Q.   Okay.  So at that time you had already

19  filed your first complaint in this lawsuit,

20  right?

21      A.   Yes.

22      Q.   Did you talk to Gail Bonds Carpenter when

23  you went there that day?

24      A.   No, I just dropped the letter off.

58

Deposition of Dexter Saffold - April 12, 2016

1    Q.  But you personally handed it to her?

2    A.  Yes.

3    Q.  And you didn't say anything to her?

4    A.  No.

5    Q.  Okay.  Had you registered or attempted to

6    register back at South Suburban College since the

7    fall of 2014?

8    A.  No, I haven't.

9    Q.  Do you know, and you might not know or you

10   might know, do you know if there's a law or a

11   rule that would require the college to provide

12   you with someone to sit next to you and talk to

13   you during class?

14   A.  I don't know if there's a law, but I do

15   know under ADA guidelines that I'm entitled to

16   certain benefits, to have a note-taker,

17   et cetera, and stuff like that.

18           Now sitting next to you, I don't know

19   nothing about that part, but I do know I'm

20   entitled to certain things under -- because how

21   else would they communicate if they're not there

22   next to me.

23           Because that's like you sitting across

24   from me taking down everything and the things I

Deposition of Dexter Saffold - April 12, 2016

1   say so I won't be out of order, you know, you

2   sitting there taking notes about this case, how

3   would you able to take notes if you're all the

4   way in the other room or behind me somewhere

5   taking notes and I'm right here, you know, that's

6   basically what a note-taker does.

7       Q.  So is it your understanding that the

8   there's a rule or law that requires that a

9   note-taker sit right next to you?

10      A.  Not that I know of, I don't know.

11      Q.  Is it part of your complaint in this case

12  against the college that the college would not

13  allow a note-taker to sit right next to you?

14      A.  No, my complaint with the college is they

15  would not -- they dropped me because I'm visually

16  impaired and they would not provide me the

17  service after giving it to me and then taking it

18  away, that's what my lawsuit is.

19      Q.  I just have to go back a second then to

20  make sure.  In the other semesters that you

21  attended before the fall of 2014, is it your

22  testimony that whenever a note-taker was there,

23  and I understand sometimes they were absent, but

24  whenever a note-taker was with you in class they

Deposition of Dexter Saffold - April 12, 2016

1   always sat next to you?

2       A.   I had to read stuff to --

3       Q.   That's a yes or no.   Did they always sit

4   next to you?

5       A.   Yes.

6       Q.   Always, in every --

7       A.   Yes.

8       Q.   -- every time you were there in all those

9   semesters?

10      A.   Yes.

11          MR. CANNON:   Okay.   Let's go off the record

12  so I can review my notes.   Just bear with me for

13  a couple of minutes.

14                          (Short pause.)

15  BY MR. CANNON:

16      Q.   Back on the record.   There's just one other

17  area I want to ask you some questions about, Mr.

18  Saffold.   Do you know how the attendance record

19  is kept in the GED class, who does it or how they

20  do it or anything like that?

21      A.   No.

22      Q.   Have you ever seen something called an

23  attendance sheet for the classes you were in?

24      A.   No.

Deposition of Dexter Saffold - April 12, 2016

1          MR. CANNON:  I think that's all I have.

2                    EXAMINATION

3    BY MR. HOFELD:

4      Q.  Mr. Saffold, I have a few follow-up

5    questions for you.  During your conversation with

6    Gail Bonds Carpenter that you told us about, you

7    told us a little bit about what she said as far

8    as why she indicated the college could not

9    accommodate you with a note-taker, you talked

10   about that today, correct?

11     A.  Um-hmm.

12     Q.  You remember those questions?

13     A.  Yes.

14     Q.  Okay.  During that conversation did

15   Ms. Bonds Carpenter say anything about there

16   being a staff shortage or some kind of issue with

17   staffing as far as part of why they could not

18   accommodate you with a note-taker?

19     A.  Yes.

20          MR. CANNON:  I'll just object to the

21   leading nature of the question.

22               You can answer.

23   BY MR. HOFELD:

24     Q.  What did she say about that?

62

Deposition of Dexter Saffold - April 12, 2016

1    A.   They said they were due to the budget fall
2 and cuts and stuff that they was making in
3 Springfield, that certain people was allowed to
4 have certain things, like if you was totally
5 disabled and needed a note-taker or that needed
6 certain like personal assistance through school,
7 the government was paying that.
8         And I said not for people that's
9 visually impaired because they want us to have
10 our GED too so we can get back into the work
11 force and be able to finish school as well,
12 they're not cutting from these programs.
13    Q.   Did she say anything in response to what
14 you said?
15    A.   I said you need to go take an ADA class,
16 that's what I told her.
17    Q.   Okay, so in the same conversation did she
18 say anything to you about whether -- anything
19 beyond what you just told me or told us about
20 whether their funding had been cut or their
21 program had been cut in some fashion, or was that
22 the extent of it, what you just told me?
23    A.   That was the extent of it.  And I told her,
24 I said not for people that's visually impaired

Deposition of Dexter Saffold - April 12, 2016

1    they're not cutting these programs, they're not

2    cutting for that.

3        Q.  And what did she say in response?

4        A.  She said something, but I don't remember.

5    But I do remember me telling her you need to go

6    take some ADA classes that they have people go

7    through.  And she said I did, I have my ADA

8    certification, and I said well, they should take

9    it back.  That's what I told her.

10       Q.  And this would have been during the

11   conversation you had on Thursday, right?

12       A.  Yes, um-hmm, yeah.

13       Q.  As far as the note-taker, you told us no

14   note-taker showed up on the first day of class on

15   Monday, correct?

16       A.  That's right.

17       Q.  On Tuesday the second day of class no

18   note-taker showed up, correct?

19       A.  Right.

20       Q.  But eventually later on that morning

21   somebody came down to try to fill in and take

22   notes for you?

23       A.  Yeah, the lady from the office, GED office.

24       Q.  Roughly, and I'm not looking for exact

Deposition of Dexter Saffold - April 12, 2016

1   times, but if class started at 9:00 o'clock,

2   approximately how long was it before that person

3   ended up coming down to the class?

4       A.   Well, she came down around the break time,

5   around the break time, around -- a little bit

6   before we went on break because normally people

7   be in there goofing off, and when somebody come

8   in from the front office everybody gets quiet,

9   you know, so that's around there between right

10  before we went to break and after she came down

11  and took the notes for me.

12      Q.   Got it.   On Wednesday September 17 I

13  believe you told us that a note-taker showed up

14  but they were late; is that correct?

15      A.   Yes.

16      Q.   Are we talking about one minute late, an

17  hour late, something more than that, what's your

18  best estimate as far as when they showed up?

19      A.   About an hour and a half late.

20      Q.   You talked about Gail Bonds Carpenter

21  coming down to your classroom on Thursday, right?

22      A.   Yes.

23      Q.   Was it your belief at that time when she

24  was coming back down to the class with you that

Deposition of Dexter Saffold - April 12, 2016

1  she was going to help take notes for you?

2     A.  Yes.

3     Q.  And that turned out not to be the case, she

4  didn't take notes for you, correct?

5     A.  No.

6     Q.  Okay.  As far as what you wanted in regard

7  to a note-taker in the fall 2014 semester, would

8  it be accurate to say that all you wanted was the

9  exact same thing that you had been previously

10  provided in prior semesters as far as a

11  note-taker who would take notes?

12        MR. CANNON:  Objection, leading, but you

13  can answer.

14        THE WITNESS:  Yes.

15  BY MR. HOFELD:

16     Q.  You weren't doing anything differently or

17  seeking to do anything differently as far as a

18  note-taker was concerned in 2014 than in any

19  prior semester; is that right?

20     A.  That's right.

21     Q.  All you wanted was the same thing you had

22  before?

23     A.  Right.

24     Q.  But you weren't given that?

Deposition of Dexter Saffold - April 12, 2016

1      A.  That's right, given it and then they took

2  it away.

3      Q.  With regard to Friday, the last day of

4  class that week, I can't remember what you said

5  about that, but to the best of your memory and

6  belief were you provided a note-taker on Friday?

7      A.  No, I don't recall the note-taker coming

8  down at all.

9          MR. HOFELD:  Okay, that's all I have for

10  you.

11                  FURTHER EXAMINATION

12  BY MR. CANNON:

13      Q.  All right, and I just have one follow-up.

14  This is off of Exhibit 1, the last page where

15  there's that letter dated October 8, 2014.

16              Is it your testimony that this letter

17  from Dr. Shukla requested the exact same

18  accommodations that you had previously received

19  in other semesters at South Suburban College?

20      A.  It is the same letter.  Can I --

21      Q.  No, no.  Does it request exactly what you

22  had before?

23      A.  Yes, all the letters I gave them from

24  different doctors.

Deposition of Dexter Saffold - April 12, 2016

1          MR. CANNON:  Okay, thank you.

2                    FURTHER EXAMINATION

3  BY MR. HOFELD:

4     Q.  Well, let me ask some follow-up based on

5  that.   So Dexter, we've been through the

6  chronology already today, and as I understand

7  your testimony you told us that for the fall of

8  2014 semester you registered for classes on

9  September 8, 2014, and then the first day of

10  class was September 15, 2014, so one week later,

11  and by the end of that week you had been dropped

12  from the class, correct?

13          MR. CANNON:  Objection, beyond the scope of

14  the redirect by about ten miles, but I stated my

15  objection.

16               You can answer.

17          THE WITNESS:  Will you repeat it?

18          MR. HOFELD:  Sure.  Would you read it back

19  for him.

20                         (Whereupon the record was

21                          read as requested.)

22          THE WITNESS:  Yes.

23  BY MR. HOFELD:

24     Q.  Okay, and prior to the first day of class,

Deposition of Dexter Saffold - April 12, 2016

1   prior to September 15 you had applied for

2   accommodations and it had been communicated to

3   you that you were going to receive accommodations

4   including a note-taker, correct?

5       A.  Right.

6           MR. CANNON:  Objection, beyond the scope of

7   the redirect.

8           MR. HOFELD:  You can have a standing scope

9   objection.

10          MR. CANNON:  I'm going to have a standing

11  scope objection to this entire out of order line

12  of questioning for the record.  Thank you.

13  BY MR. HOFELD:

14      Q.  So let me ask you this, Dexter.  At any

15  time prior to being dropped from this class did

16  anyone from the school ever tell you that your

17  paperwork for accommodations was not in order or

18  that you, for whatever reason, you didn't have a

19  sufficient disability or that they were going to

20  not provide you accommodations for any reason

21  whatsoever other than what you've already told us

22  Gail Bonds said to you?

23      A.  No.

24          MR. HOFELD:  Okay, thank you.  That's all I

Deposition of Dexter Saffold - April 12, 2016

1    have.

2              MR. CANNON:  No further questions.

3         MR. HOFELD:  We will waive signature.

4                    (Whereupon, at 4:15 p.m., the

5                     signature of the witness having

6                     been waived, witness being present

7                     and consenting thereto, the taking

8                     of the instant deposition ceased.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Deposition of Dexter Saffold - April 12, 2016

```
 1   STATE OF ILLINOIS   )
                         )  SS.
 2   COUNTY OF C O O K   )

 3

 4

 5              I, Loretta K. Adams, a Notary

 6   Public within and for the County of Cook and

 7   State of Illinois, do hereby certify that

 8   heretofore, to-wit, on the 12th day of April

 9   A.D., 2016, personally appeared before me at

10   33 North Dearborn Street, Suite 1530, Chicago,

11   Illinois, DEXTER SAFFOLD, a witness in a certain

12   cause now pending and undetermined in the United

13   States District Court for the Northern District

14   of Illinois, Eastern Division, wherein

15   DEXTER SAFFOLD is the plaintiff, and

16   SOUTH SUBURBAN COLLEGE is the defendant.

17              I further certify that said witness

18   was by me first duly sworn to testify the truth,

19   the whole truth, and nothing but the truth in the

20   cause aforesaid; that the testimony then given by

21   the said witness was reported stenographically by

22   me in the presence of said witness; and

23   afterwards reduced to typewriting and the

24   foregoing is a true and correct transcript of the
```

Deposition of Dexter Saffold - April 12, 2016

1    testimony so given by said witness as aforesaid.

2                    I further certify that the

3    signature of the witness to the foregoing

4    deposition was waived by agreement of counsel for

5    the respective parties.

6                    I further certify that the taking

7    of this deposition was in pursuance of notice,

8    and that there were present at the taking of this

9    deposition MR. BRYAN S. HOFELD on behalf of the

10   Plaintiff; and MR. DANIEL E. CANNON on behalf of

11   the Defendant.

12                   In testimony whereof:  I hereunto

13   set my hand and affixed my notarial seal this

14   24th day of April, A.D., 2016.

15

16

17               Loretta K. Adams, CSR, RPR
                 CSR License # 084-003611

18

19

20

21

22

23

24



**SERVICES FOR STUDENTS WITH DISABILITIES OFFICE**
**ACADEMIC ACCOMMODATION PASSPORT**

*To:* Dexter Saffold        *Course:*                *Date: Fall  2014*

Please immediately contact a <u>Special Needs Counselor Ext 2306</u> with academic concerns or <u>Student Specialist Ext 2572, or Gail Bonds Carpenter Ext 2691</u> with accommodation questions.

- *Preferential Seating* -- Student may be hard of hearing, visually impaired, have problems with distractibility, have a medical condition, or may use a wheel chair.

- *Tape Record Lecture* — The student has signed a contract stating that the tapes will be used for study only and will not be used outside of context of the class.

- *Note Taker-will assist for the computer access, and type the answer for Dexter, Dexter must provide the answer to the note taker.*

- *Test or Class Material in Another Format* — large print, tape or diskette. The instructor can provide the materials or contact the Services for Students with Disabilities office for assistance.

- *Distraction Reduced Testing* — In the Assessment Center, a quiet room or office.  *

- *Extended Test Time* — 2.0 extended time for quiz and test  *

- *Test Dictation* — A print processing disability or a visual impairment is present.  *

- *Test Scribe* — A physical disability impairs the ability to write test answers.

- *Other* — This student is eligible for the above accommodations except when limited by class criterion/essential eligibilities.

- <u>Instructor:</u> If you utilize the Assessment Center to provide the above listed asterisk options, please directly deliver the quiz or test to the Assessment Center, Room 2266.  *
- <u>Instructor:</u> Please immediately notify the SSDO Student Specialist at extension 2572 or SSDO manager at extension 2691 with accommodation issues.
- <u>Instructor:</u> Please immediately notify a Special Needs Counselor at extension 2306 for academic concerns.

- <u>Student:</u> Please notify the SSDO Specialist three days in advance if you need test dictation, test scribe, or sign language interpreter for testing.

These services are in accordance with <u>*Section 504 of the Rehabilitation Act of 1973, Sub part E,*</u> which states: Colleges and universities may *NOT* measure student achievement using modes that adversely discriminate against the student with a disability. Information about a student's disability or accommodation is considered CONFIDENTIAL.

*Approved by: SSDO Team*
*Distributed by: Gail Bonds-Carpenter*

Revis



PLAINTIFF'S EXHIBIT B

IN THE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Dexter Saffold, | ) | |
| | ) | |
| Plaintiff, | ) | No. 14cv07468 |
| | ) | |
| South Suburban College, | ) | Judge John Robert Blakey |
| | ) | |
| Defendant, | ) | Magistrate Judge Martin |

### CERTIFICATE OF SERVICE

To:   DANIEL E. CANNON
      Kusper & Raucci, Chtd.
      33 North Dearborn Street
      Suite 1350
      Chicago, IL 60602
      PHONE:      312-332-5000
      EMAIL:      dec@kusperraucci.com

    The undersigned attorney certifies that he served by email at dec@kusperraucci.com Upon attorney of record Daniel E. Cannon, true copies of the foregoing Plaintiff's Answers to Defendant's Interrogatories on March 21, 2016.

By: _____
              Bryan Hofeld

Bryan Hofeld, Esq.
Hofeld and Schaffner
30 N. LaSalle, Suite 3120
Chicago, IL 60602
(312) 372-4250
Attorney for Plaintiff



PLAINTIFF'S EXHIBIT
C
tabbies

# IN THE
# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **Dexter Saffold,** | ) | |
| | ) | |
| Plaintiff, | ) | No. 14cv07468 |
| | ) | |
| **South Suburban College,** | ) | Judge John Robert Blakey |
| | ) | |
| Defendant, | ) | Magistrate Judge Martin |

### Plaintiff's Answers to Defendant's Interrogatories

1.   State your full name, address, date of birth and current place of employment.

**ANSWER: Dexter Saffold.  Plaintiff refers defendant to its own records which provide plaintiff's address and date of birth.**

2.   State all sources of your income from January 1, 2013 to the present, including the name, address and

5.    State your highest level of education and, for any degrees or certificates you have sought or obtained after high school, state the name and address of each institution at which you sought or obtained a certificate or degree, the year(s) of your attendance, and the type of, or name of, each certificate or degree you sought or obtained.

**ANSWER: See answer to no. 2.**

6.    Describe the specific accommodation that you sought for the fall 2014 semester, but that was refused or denied by the defendant.

**ANSWER: Plaintiff was denied each and every accommodation defendant claims to have offered.**

7.    State whether there was a meeting scheduled for September 22, 2014 with Gail Bonds Carpenter and Patrice Burton and, if your answer is in the affirmative, state the reason or reasons that you did not attend.

**ANSWER: Plaintiff recalls some discussion of a meeting but plaintiff had already been denied accommodations due to his disability and thus the violations had already occurred.**

8. State every semester that you attended South Suburban College, by year and either spring or fall, and the course or courses that you registered for in each such semester.

**ANSWER: Plaintiff refers defendant to its own records which provides the requested information.**

9. State the name, address and telephone number of each individual who may have discoverable information, or whom you may call to testify at trial, in support of your claims, and identify the subject(s) of information for each such individual.

**ANSWER: As defendant has not yet answered the complaint and discovery has not yet begun other than**

limited discovery directed to the issues raised in defendant's motion for summary judgment, this request is premature. With regard to the issues raised in defendant's motion for summary judgment, certainly Gail Barnes would possess relevant information. Investigation continues.

10. Provide a computation for each category of damages that you claim and identify all documents or other materials on which your computation is based as required under F.R.C.P. 26 (a) (I) (C).

**ANSWER: See answers to no. 2 and no. 9.**

11. Identify each person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence, identify the written report of each such witness, and provide all other disclosures required under F.R.C.P. 26 (a) (2).

**ANSWER: See answers to no. 2 and no. 9.**

STATE OF ILLINOIS     )
                      )     s.s.
COUNTY OF C O O K     )

    I, **DEXTER SAFFOLD,** being first duly sworn on oath, depose and say that I have read the above and foregoing Answers to Interrogatories, by me subscribed, and the same are true and correct to the best of my knowledge, information and belief.

_____
**DEXTER SAFFOLD**

SUBSCRIBED AND SWORN TO
before me this ___1/th___

day of ___March___, ___2016___.

_____
**NOTARY PUBLIC**

OFFICIAL SEAL
MARGELENE DELEON
NOTARY PUBLIC · STATE OF ILLINOIS
MY COMMISSION EXPIRES:08/15/16

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DEXTER SAFFOLD,                          )
                                         )
                    Plaintiff,           )
                                         )
        vs.                              ) No. 14 CV 07468
                                         )
SOUTH SUBURBAN COLLEGE,                  )
                                         )
                    Defendant.           )


        The deposition of GAIL BONDS-CARPENTER,

called by the plaintiff for examination pursuant to

notice and pursuant to the Rules of Civil Procedure

for the United States District Courts pertaining to

the taking of depositions, taken before Devan J.

Moore, a certified shorthand reporter within and for

the County of Cook and State of Illinois, at Suite

30 North LaSalle Street, Chicago, Illinois, on the

8th day of April 2016.



```
 1          APPEARANCES:

 2                HOFELD and SCHAFFNER, by
                  MR. BRYAN HOFELD
 3                30 North LaSalle Street
                  Suite 3120
 4                Chicago, IL  60602
                  (312)372-4250
 5                    for the plaintiff;

 6                KUSPER & RAUCCI, CHTD., by
                  MR. DANIEL E. CANNON
 7                30 North LaSalle Street
                  Suite 3400
 8                Chicago, IL  60602
                  (312)332-5000
 9                    for the defendant.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                    I N D E X
     Witness:                              Page
 2   GAIL BONDS-CARPENTER
          Examination by:
 3            Mr. Hofeld                     4

 4

 5

 6              E X H I B I T S
     Number                                Page
     Bonds-Carpenter Deposition Exhibit No. 1     10
 7

 8

 9        C E R T I F I E D   Q U E S T I O N S
     Page                                  Line
10   None.

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

1                    (Witness sworn.)

2                 GAIL BONDS-CARPENTER,

3     called as a witness herein, having been first duly

4     sworn, was examined and testified as follows:

5                    EXAMINATION

6                        BY

7                    MR. HOFELD:

8         Q    Would you please introduce yourself and

9     state your name for the record.

10        A    Gail Bonds-Carpenter.

11        Q    And should I call you -- is it

12    Ms. Bonds-Carpenter, or just Ms. Carpenter, or just

13    Ms. Bonds?

14        A    It really doesn't matter.

15        MR. CANNON:  How about Gail?

16        THE WITNESS:  That's fine.

17        MR. HOFELD:  Gail?  Okay.  Sounds good.

18    BY MR. HOFELD:

19        Q    Gail, we met briefly before the deposition.

20    My name is Bryan Hofeld.  As you know, I've been

21    appointed by the Court to represent a gentleman named

22    Dexter Saffold who has a lawsuit that relates to

23    events that occurred back in the fall of 2014.  So

24    I'm going to be asking you questions here today about

1    those events -- or those alleged events.  And I don't

2    anticipate that this will be extremely long.

3              First of all, have you given a

4    deposition before?

5         A    No.

6         Q    Okay.  So let me go over some ground rules.

7    And I may be just repeating what the gentleman to

8    your right has already gone over with you, in terms

9    of ground rules; but a few things that will help this

10   process go smoothly so that we can be done faster.

11             First and foremost, if I ask you

12   something that doesn't make sense or that you don't

13   understand, let me know.  Okay?  You're not going to

14   hurt my feelings.  It wouldn't be the first time.

15   Just let me know that it doesn't make sense or you're

16   not following me, and I'll try to ask it in a more

17   understandable way.  Fair enough?

18        A    Yes.

19        Q    And that leads me to my next thing, which

20   is if you can please keep all of your answers in

21   verbal word form as opposed to simply nodding and

22   things we all do in everyday life.  But for a

23   deposition, because we have a court reporter here,

24   there needs to be a clear record with words.  Okay?

1     A    Okay.

2     Q    In addition to that, if you can, just as

3 you've been doing --

4            If you can wait until I'm done with my

5 complete question before you begin your answer so

6 that we're not talking over one another -- again, so

7 that we can have a clear record -- that would be much

8 appreciated.

9            And, you know, there's going to be a

10 lot of times probably where you know where I'm going

11 or what I'm going to ask you before I'm done with the

12 question.  That being the case, I still need you to

13 wait until I'm done with the entire question before

14 you start your answer.  Fair enough?

15     A    Fair.

16     Q    In addition to that, if I ever cut you off

17 and you weren't done with an answer, just let me know

18 and I will shut up and let you finish your answer.

19 Okay?

20     A    Okay.

21     Q    If you want to take a break at any time for

22 any reason, you don't need to tell us why.  Just say

23 you'd like to take a break, and we will take a break

24 at any time.  You should feel free to do that.

1                    And I think last, but not least, in

2    terms of ground rules, if there's anything you should

3    want to look at or refer to today -- any records,

4    anything at all -- you should feel free to do that.

5                    I do want to find out what you recall

6    about the events that relate to this case.  But if

7    there are documents that would also be helpful to you

8    in giving answers, you should feel free to do that.

9    Sound good?

10        A    Sounds great.

11        Q    All right.  Wonderful.

12                    So you are currently employed; is that

13   correct?

14        A    Correct.

15        Q    And whom are you employed by?

16        A    South Suburban College.

17        Q    How long have you been employed there?

18        A    2 years and 9 months.

19        Q    So without trying to do that math off the

20   top of my head -- although, I know I could do it if I

21   tried -- but do you know what month and year you

22   started in?

23        A    I do.  July 2013.

24        Q    Have you held the same position the entire

1    time you've been there?

2         A    I have.

3         Q    And what position is that?

4         A    Manager of Services For Students With

5    Disabilities.

6         Q    I'll come back to that in a little bit.

7    But what I'd like to do before that is -- if you

8    could summarize your educational background for me,

9    and then I'm going to go into your employment history

10   leading up to your current job.  Okay?

11             So if you can start with your

12   educational background, and if you could just sort of

13   give me a summary of that, if you would.

14        A    Of course.  I achieved an Associate of

15   Science from South Suburban College in 2001.  I

16   continued on and graduated with an undergraduate

17   degree of Liberal Arts and a minor in social work in

18   2009.  In 2011 I achieved a master's in social work.

19        Q    And then, in terms of your employment

20   history before you started with South Suburban

21   College, if you could tell me about that.

22        A    Catholic Charities for the gerontology

23   population.  Prior to that, the school district as a

24   paraprofessional.

1      Q      And what school district?

2      A      170, Chicago Heights.

3      Q      When did you work there?

4      A      2007 up until 2009.

5      Q      And what was the position that you said?

6      A      A paraprofessional.

7      Q      And what is that?

8      A      Almost a substitute teacher -- a

9    co-teacher.  I'll say a co-teacher.

10     Q      What was the other position that you

11   mentioned with Catholic Charities, I think you said?

12     A      Case Manager.

13     Q      And when did you work for Catholic

14   Charities?

15     A      2010 until 2011.

16     Q      And you said you were a case manager.  Can

17   you tell me a little bit more about that.  You

18   mentioned it a little bit earlier, but if you can

19   sort of give me an overview of what that job

20   involved.

21     A      I would do assessments for homecare for the

22   gerontology population.  I would go into the home and

23   do assessments.

24     Q      Now, with regard to Mr. Saffold, my

1    understanding is that he had taken classes at South

2    Suburban College even prior to the Fall 2014

3    semester; is that correct?

4        A    Correct.

5        Q    In terms of what I'm interested in today,

6    I'm interested in talking about the Fall 2014

7    semester, and so I'm going to just sort of cut to the

8    chase and go right to that.

9                And, you know, stuff that happened

10   before that may or may not come up.  I don't know.

11   But I'd like to sort of focus on that, if I could.

12                I'm going to show you what I'm going

13   to have marked as Exhibit No. 1 for identification?

14                        (Whereupon, Bonds-Carpenter

15                         Deposition Exhibit No. 1 was

16                         marked for identification.)

17   BY MR. HOFELD:

18       Q    And if you be kind enough to take a look at

19   that and tell me if you recognize that document?

20       A    I do.

21       Q    And what is that?

22       A    A passport.

23       Q    When you say, "a passport", what is that

24   passport?  What are you referring to?

1       A    You have a listing of accommodations that

2  the students have been approved for via an

3  interactive process.

4       Q    So this is the passport form that details

5  the accommodations, as I understand it -- and correct

6  me if I'm wrong -- but that Mr. Saffold applied for

7  and was granted for the Fall 2014 semester at South

8  Suburban College.  Do I have that correct?

9       A    You do.

10      Q    And this is a document that you've, no

11  doubt, seen before today?

12      A    Correct.

13      Q    All right.  With regard to this passport,

14  as I understand it from your affidavit -- the

15  affidavit that you gave in this case -- this passport

16  for the Fall 2014 semester, Exhibit No. 1, contains

17  every possible accommodation that can be given to a

18  student who is visually impaired or blind; is that

19  accurate?

20      A    Correct.

21      Q    And with regard to each of the

22  accommodations that are listed on this form, am I

23  correct that he applied for and received or was

24  granted each and every one of these accommodations

1    that is listed on this form?

2        A    Correct.

3        Q    And with regard to each of these

4    accommodations on this form, they were all to be

5    provided and were to go into effect as of the very

6    start of the fall semester, which was I believe

7    Monday, September 15th, 2014; is that correct?

8        A    Correct.

9        Q    Specifically, with regard to a note taker,

10   do you see the entry -- it's the third bullet point

11   down that starts with "note taker"?

12       A    I do.

13       Q    Can you tell me what your understanding is,

14   as far as that accommodation and what that would

15   involve or what that would look like in regards to

16   Mr. Saffold for that semester?

17       A    We provide -- "we", the Services For

18   Students With Disabilities Office -- provide note

19   takers for students who request note takers.  That

20   person would go into the classroom and take the notes

21   during the class session.

22       Q    So that part I understand.  They would take

23   notes from the lecture or whatever was happening in

24   the class at that time; is that correct?

1      A     That's correct.

2      Q     Would they perform any other functions, to

3  your understanding -- in other words, like, for

4  example, reading to the student or anything else --

5  or is it strictly notetaking?

6      A     Strictly notetaking.

7      Q     With regard to that specific accommodation,

8  you already told me that that one, as with all of the

9  others listed on here -- those were ready to be

10  provided to him as of the first day of class on for

11  that semester?

12      A     Correct.

13      Q     So we talked about how the first day of

14  class was September 15th, 2014, which was a Monday.

15  Does that sound right?  Does that sound consistent

16  with your understanding, that that would have been a

17  Monday?

18      A     Yeah.

19      Q     I'm just trying to get us oriented here.

20  So I just sort of want to run through that first

21  week.

22            On September 15th, 2014, the first day

23  of class, was Mr. Saffold provided a note taker?

24      A     Yes.

Page 14

1      Q      And who was that person?

2      A      I don't remember.

3      Q      Would there be a record of that?

4      A      Possibly.

5      Q      And where would you look, or what kind of

6   record would there be?

7      A      We, at times, keep schedules of all of the

8   note takers and their responsibilities.

9      Q      So, to the best of your knowledge and

10  belief, do you believe that there would be a record

11  that the college would have that would show who the

12  note taker was on that date?

13     A      Not readily available.

14     Q      I don't know what you mean by "readily

15  available"?

16     A      I would have to look through files maybe

17  and find it.

18     Q      Okay.  And I understand, obviously, that

19  it's not readily available as we sit here today in my

20  office; but do you believe there would be a record of

21  that for you to look through the files back at the

22  college?

23     A      Correct.

24     Q      All right.  With regard to the next day --

1    so Tuesday, September 16th 2014 -- was Mr. Saffold

2    provided a note taker?

3         A    Yes.

4         Q    Do you know who that person was?

5         A    No.

6         Q    Same question: Do you believe -- if you

7    checked, do you believe there's a record that would

8    identify that person?

9         A    Yes.

10        Q    Moving to the next day, the 17th, was he

11   provided a note taker that day?

12        A    Yes.

13        Q    Same question?

14        A    Yes.

15        Q    You don't know who they are as you sit

16   here, but you believe you could find that out in the

17   records back at the college?

18        A    Correct.

19        Q    The same with the 18th, was he provided a

20   note taker on that day?

21        A    Yes.

22        Q    And you don't know who that is, you don't

23   recall; but you believe there's a record of that?

24        A    Correct.

Page 16

1      Q      And it would be the custom and practice of

2    the college to keep such records -- keep records of

3    who the note takers were for the students, things

4    like that; would that be correct?

5      A      I'm not sure what you're asking.

6      Q      I mean, it would be the regular practice of

7    the college to keep those types of records?

8      A      Yes.

9      Q      With regard to -- I'm going to go back

10   through now.

11                  With regard to the first day, going

12   back to Monday, September 15th, 2004 -- and I want

13   you to correct me if I'm wrong -- but are you telling

14   me that on that date -- well, strike that.  Let me

15   back up.

16                  As I understand it, his class that he

17   was enrolled for --

18                  The GED class was, first of all, what

19   he was enrolled for; correct?

20     A      Correct.

21     Q      And, as I understand it, that started at

22   9:00 a.m. each morning, and it was a Monday through

23   Friday class.  Is that your understanding?

24     A      That's my understanding, but that's not my

1    area.

2         Q    When you say it's not your area, what do

3    you mean?

4         A    The GED Department.

5         Q    Okay.  But, generally, from your

6    involvement in this case, it's your understanding

7    that that's the class that he was taking, and it

8    started at 9:00 a.m.?

9         A    Correct.

10        Q    So is it your testimony that on the first

11   day of his class, his GED class, September 15th,

12   there was a note taker physically present in that

13   class at 9:00 a.m. ready to be a note taker for

14   Mr. Saffold?

15        A    Correct.

16        Q    And would the same be true for each of

17   those other days that we went through -- the 16th,

18   the 17th, and the 18th?

19        A    Correct.

20        Q    So is it your testimony and your

21   understanding that any note takers -- you know,

22   whoever they were -- that were provided for him

23   during those days, they were not -- I mean, they were

24   there at 9:00 a.m.  They weren't late.  They didn't

1    show up later at 9:30, or 10:00, or 10:30, or

2    anything else like that.  Do I have that correct?

3         A    Could you repeat that.

4         Q    Absolutely.

5         MR. HOFELD:  Could we read that question back,

6    please -- you know what?  Let me withdraw it.

7    BY MR. HOFELD:

8         Q    To your knowledge, were any of the note

9    takers late for any of those mornings?

10        A    No.

11        Q    In other words, you're telling me that you

12   know that they were not late?  There wasn't a morning

13   where a note taker was late for any of his classes;

14   is that correct?

15        A    Well, what you're asking me -- first of

16   all, you're asking me to go back to 2014.  And to be

17   absolutely clear, I'm not sure if I remember each day

18   that a note taker was supposed to be there and if --

19   whether or not they were running late or not.

20             Is that what you're asking me?

21        Q    Well, here, I understand that it's been

22   some time since these events occurred.  So my

23   question is simply this:

24             Based on what you can remember, do you

1    have any memory or knowledge of the note taker ever

2    being late on any of those days that we talked about?

3         A    Yes.

4         Q    You do have knowledge of that?

5         A    Yes.

6         Q    All right.  Tell me what you're talking

7    about.

8         A    Once before, the department called up

9    stating that the note taker had not made it in.

10        Q    When you say, "once before", when are you

11   referring to?

12        A    It could be within that 2014 year.  It

13   could have been, but the actual time I'm not clear.

14        Q    So did this happen, to the best of your

15   knowledge and belief, one time during the 2014

16   semester, that first week that we're talking about --

17   one time or more than one time?

18        A    One time.

19        Q    All right.  So let's talk about that one

20   time.  So tell me what your understanding is of that

21   one time.

22        A    The note taker was tardy, and the GED (sic)

23   called the department, my department, and requested

24   knowledge of where the note taker was; and we

Page 20

1    explained that we didn't know.  The note taker had

2    not called in.  And we provided a note taker in that

3    note taker's stead.  So we made certain that a note

4    taker was able to go down to provide services at that

5    time.

6         Q    For that same morning, that same class

7    where the original note taker hadn't showed up?

8         A    Correct.

9         Q    And as far as any details concerning

10   times -- you know, how late or at what point the

11   replacement note taker showed or any of those

12   things -- do you have any memory or knowledge about

13   that as you sit here now?

14        A    No, I don't.

15        Q    I mean, do you know -- did the replacement

16   note taker make it there within a few minutes, or was

17   it an hour, or an hour and a half, or some other

18   time; or do you know anything about that?

19        A    Possibly an hour.

20        Q    That would be your best estimate as you sit

21   here now?

22        A    Correct.

23        Q    With regard to the original note taker, you

24   don't know who that person was?

```
 1      A    No.

 2      Q    Do you know if they were male, female,

 3   black, white, or some other race?  Anything like

 4   that?

 5      A    I do know the race.  The race was

 6   African-American.

 7      Q    Okay.  Male?  Female?

 8      A    No, I'm not certain.

 9      Q    Student?

10      A    It was a student.

11      Q    And then what about the replacement note

12   taker?

13      A    The student specialist.

14      Q    Who is that?

15      A    She's the student specialist that works in

16   the Services For Students With Disabilities Office.

17      Q    And what is her name?

18      A    Shannon Smith.

19      Q    And she's the person that acted as the

20   replacement note taker?

21      A    Correct.

22      Q    Tell me a little bit about how -- where

23   note takers usually come from, or how they're found,

24   or how they come to be note takers.  Tell me about
```

1    that.

2        A    They're students.  You must be a student.

3    And they either have financial aid or work study

4    monies.

5        Q    What I want to do at this point is I want

6    to go through and find out what your knowledge is or

7    your memory is about interactions that you had with

8    Mr. Saffold that relate to the Fall 2014 semester.

9    Okay?

10                   And I mean interactions in the

11   broadest sense.  That could be conversations that you

12   had with him.  It could be things that you said, or

13   conversations that you were present for, or really

14   anything else.  I mean it in the broadest sense.  So

15   I want to run through that.  And I understand that

16   it's been some time, but I need to find out what you

17   know and what you remember.

18                   So, again, specifically in regards to

19   the Fall 2014 semester, do you know how many

20   conversations or interactions you've had with him in

21   regards to that Fall 2014 semester?  If we can start

22   off with some kind of number, then we can go through

23   each of them.

24       A    The GED, they have 2 sessions.  Typically,

1    when a student comes up for a passport, it's just

2    that one time.  So I want to say twice.

3        Q    When you say, "twice", what happened twice?

4    What are you referring to?

5        A    Interactions.  Communication.

6        Q    Between you and Mr. Saffold?

7        A    Correct.

8        Q    All right.  So that makes it easy.  So

9    let's talk about the first one.

10                   What was the first interaction that

11   you're referring to that you had with him?

12       A    I believe he called and stated that he was

13   going to be taking the GED courses.

14       Q    This would have been, like, the month

15   before, in August or something like that?

16       A    I don't remember exactly.

17       Q    All right.  So he called.  And is this

18   phone call -- is this what you're talking about, as

19   far as the first interaction?

20       A    Correct.

21       Q    All right.  So what I need you to do is

22   tell me everything you remember about what he said to

23   you and what you said to him in that phone call

24   beyond what you've already told me.

```
 1      A     Okay.  He phoned and stated he was going to
 2  be returning to the GED program, and I informed him
 3  that I'll make certain that he will have the note
 4  taker.
 5      Q     Anything else that you can remember being
 6  discussed or said by either one of you in that call?
 7      A     No.
 8      Q     And with regard to, specifically, when that
 9  conversation occurred -- and understanding that it's
10  been a couple years -- whether that was in July 2014,
11  August 2014, or any other time, you don't recall one
12  way or the other; is that correct?
13      A     Correct.
14      Q     Tell me about the second interaction you
15  had with him.
16      A     That would have taken place in the fall,
17  which is typically around September or August, him
18  stating the same thing, that he would be coming back;
19  and then I would be providing him with a note taker.
20      Q     Was this another phone call?
21      A     Correct.
22      Q     Would this have been sometime before
23  classes started?
24      A     Correct.
```

Page 25

1      Q     Would this have been sometime -- strike

2    that.

3            My understanding is that he registered

4    a week before the start of classes.  Is that your

5    understanding?

6      A     I'm not sure when Dexter registered.

7      Q     All right.  This second phone call --

8    understanding you don't recall exactly when it

9    occurred -- but would it have been sometime prior to

10   the start of classes?

11     A     Possibly.

12     Q     So it may or may not have been; you're not

13   sure?

14     A     Correct.

15     Q     And tell me again what you recall about

16   what was discussed and what was said by each of you.

17     A     Dexter stated that he was returning, and I

18   shared that I would have the note taker available.

19     Q     It sounds like to me that was before

20   classes started.  Would you agree with that?

21     A     I would.

22     Q     Other than those 2 telephone conversations

23   you told me about, did you have any other

24   conversations with Mr. Saffold that related in any

1    way to the Fall 2014 semester?

2         A    No.

3         Q    Other than those 2 telephone conversations,

4    did you have any other interactions of any kind with

5    him?  And, again, I'm including interactions where

6    you physically saw him or anything else like that

7    that you recall.

8         A    I don't recall.

9         Q    So just to make sure I understand what

10   you're telling me, as you sit here now you have no

11   memory of having any other interactions,

12   conversations, or anything else with Mr. Saffold in

13   relation to the Fall 2014 semester other than the 2

14   telephone conversations you just told me about; is

15   that correct?

16        A    That's correct.

17        Q    As I understand it, there is -- or there

18   was in effect at that time an attendance policy that

19   the college had for students; is that correct?

20        A    Do you mean as far as the GED Department?

21        Q    Yes, ma'am.

22        A    I'm not clear on their procedure.

23        Q    Okay.  Fair enough.  My -- strike that.

24             My understanding, at least according

1    to some information in the case -- in this case --

2    that was provided by the defendant, by the college,

3    is that Mr. Saffold was dropped from the GED class

4    due to attendance.  Is that your understanding, too?

5    Did you become aware of that at some point?

6        A    I'm not aware of that.

7        Q    So if I were to ask you anything about

8    that, you wouldn't be able to tell me anything --

9    whose decision that was, when that occurred, or

10    anything like that?

11        A    Correct.

12        Q    So I want to ask you about some other

13    specific statements and ask you if you have any

14    memory of ever saying any of these things during any

15    conversation you had with Mr. Saffold in relation to

16    the Fall 2014 semester.

17              So the first question is, during any

18    time in the fall of 2014 did you ever tell

19    Mr. Saffold that the college could not comply with

20    his request for accommodations because it didn't have

21    accommodations for working with the blind or visually

22    impaired?

23        A    No.

24        Q    At any time in 2014 did you tell

1    Mr. Saffold that there was a staff shortage or some

2    kind of issue with staffing such that accommodations

3    could not be provided to him?

4        A    No.

5        Q    All right.  Was that true?  In other words,

6    were there any staff shortages or any issues with

7    staffing that would have been prevented the college

8    from being able to provide the accommodations that

9    are outlined in that passport?

10       A    No.

11       Q    At any time during the 2014 year did you

12   tell Mr. Saffold that the program had been cut -- or

13   programs had been cut, or some kind of issue with

14   funding such that accommodations couldn't be

15   provided?

16       A    No.

17       Q    Had there been any cuts in funding or

18   programs that would have impacted the ability to

19   provide accommodations?

20       A    No.

21       Q    Did you ever tell Mr. Saffold that the

22   college just didn't have anyone or you just didn't

23   have anyone who could help him?

24       A    No.

1      Q    Did you ever tell Mr. Saffold that visually

2   impaired people can't attend GED classes?

3      A    No.

4      Q    Did you ever tell him that you're not a

5   note taker, you assign note takers?

6      A    No.

7      Q    Was that true?  In other words, you were

8   not a note taker, and that would be an accurate

9   statement?

10     A    Correct.

11     Q    Would it also be true that you did, from

12   time to time, assign note takers?

13     A    Correct.

14     Q    At any time during that first week in

15   September of 2014, did you ever go into any classroom

16   that Mr. Saffold was in?

17     A    Could you...?

18     Q    Rephrase the question?

19     A    Yeah, rephrase the question.

20     Q    Sure.

21          So at any time during the Fall 2014

22   semester that Mr. Saffold attended class, were you

23   ever physically present in any class that he was in,

24   which would be -- as far as I can understand it or

1    can tell, would be the GED class?  Were you ever

2    physically present in his GED class when he was

3    there?

4        A    Yes.

5        Q    So that sounds to me like that would be

6    another interaction of the kind I was trying to get

7    at earlier.  So let's talk about that.

8               What is your memory of that encounter,

9    or that event?

10       A    Now, there is doors between the class and

11   where I was standing.  He was sitting in the

12   classroom.  I was making sure the note taker was

13   present.  Dexter may not even have known I was there,

14   so I did not communicate with Dexter at all.

15       Q    So let me follow up.  First of all, when

16   are we talking about?

17       A    Sometime in 2014.

18       Q    Sometime during that first week of classes?

19       A    I'm not clear if it was the first week of

20   class or not.

21       Q    But we're talking about the Fall 2014

22   semester?

23       A    Correct.

24       Q    And were you physically inside the

1    classroom, or are you telling me that you were

2    standing outside the classroom?

3         A    Standing outside the classroom.

4         Q    And can you just sort of orient me a little

5    bit.  In other words, were you behind the class, or

6    on the side, or in the front?  If you can sort of

7    explain how that works.

8         A    There's a hallway that leads you to the

9    classroom, and there's a door with a window.  I

10   peeked in the door to make certain that the note

11   taker was there.

12        Q    And from your vantage point when you were

13   looking into that class, are the students facing in

14   the opposite direction?  In other words, are their

15   backs to you, or are they facing you, or some other

16   situation?

17        A    They're facing -- what is this?  East?

18        Q    I don't know.

19        A    East.  It was east.  And I was standing

20   facing north, so I could see inside the window.

21   There's a door here just like this door (indicating),

22   and I was standing on the outside of that door, and

23   the students were sitting like this.

24        Q    As you are now?

1      A      Correct.

2      Q      All right.  So the students, unless they

3  specifically looked your way, you wouldn't be in

4  their view?

5      A      Correct.

6      Q      And how long were you there, roughly?  How

7  long did you stand there?

8      A      When I spotted the note taker, I left.

9      Q      All right.  So the reason you went to stand

10  outside of the classroom was to see if the note

11  takers there.  You saw that they were there, and then

12  you left?

13      A      Correct.

14      Q      And are we talking about the replacement

15  note taker from the one day you talked about, or are

16  we talking about a different day?

17      A      No, we're talking about -- I'm not certain

18  what day it was.

19      Q      So as far as whether this was the day where

20  the replacement note taker came or some other day

21  when a note taker was there, you're not able to tell

22  me one way or the other?

23      A      Correct.

24      Q      But you saw that the note taker for

1    Mr. Saffold was there; and, having seen that, you

2    then left?

3         A    Correct.

4         Q    How many times did that occur?

5         A    Once.

6         Q    And why was it that you went there to see

7    if the note taker was in fact there?  What prompted

8    you to do that?

9         A    Many times he complained to the

10   instructors; and they may call me.  So to just follow

11   up and be the manager and be an advocate for him.  I

12   want to make certain that he's getting the services

13   that he receives -- is supposed to receive.

14        Q    Is it your recollection that there had been

15   a complaint that he had made to the instructor, and

16   that's what led to you showing up?

17        A    In the past.

18        Q    In past semesters?

19        A    Yeah.

20        Q    What about specifically in regards to this

21   2014 fall semester?  Do you know if there were any

22   complaints that you followed up on?

23        A    I don't think so.

24        Q    All right.  Again, sticking with this broad

1    as possible definition of interactions, I've got 2

2    conversations, and I've got this time where you laid

3    eyes on him for a few seconds in the classroom;

4    correct?

5        A    Did I say I laid eyes on Dexter or the note

6    taker?

7        Q    Well, you said the note taker.

8        A    Okay.

9        Q    Do you know if you saw Mr. Saffold?  Was he

10   sitting next to the note taker?  Do you remember

11   where they were in relation to each other?

12       A    I don't remember.

13       Q    All right.  So other than the 2 telephone

14   conversations and you going to the outside of that

15   class to check on the note taker -- other than those

16   3 events did you have any other interactions of any

17   kind with Mr. Saffold where you either saw him, spoke

18   to him, or heard something that he said, anything

19   like that other than those 3?

20       A    Not that I remember.

21       Q    At any time during the Fall 2014 semester

22   did you ever in any way question whether he really

23   was visually impaired or in any way suggest that he

24   wasn't or anything like that?

1      A     No.

2      Q     At any time during the Fall 2014 semester

3  did you ever in any way mock his disability directly

4  or indirectly?  Anything like that?

5      A     No.

6      Q     Do you know if there were any other blind

7  or visually impaired students receiving

8  accommodations in that Fall 2014 semester?

9      A     I'm not sure.

10     Q     There may have been, may not have been.

11 You're not able to tell me one way or the other?

12     A     Correct.

13     Q     Specifically with regard to the GED

14 class -- or classes, do you know if there were any

15 other blind or visually impaired students in that

16 semester?

17     MR. CANNON:  Excuse me.  Did you just mean

18 2014, the Fall 2014 semester?

19     MR. HOFELD:  Yes.

20     THE WITNESS:  I'm not sure.

21 BY MR. HOFELD:

22     Q     Again, it may have been; it may not have

23 been.  As you sit here now, you are not able to tell

24 me one way or the other; is that correct?

1    A    Correct.

2    Q    With regard to that exhibit, Exhibit No. 1,

3    if you look about midway down on the page, a little

4    bit lower, there's a section that starts with

5    "Other".  Then it says, "This student is eligible for

6    the above accommodations except when limited by class

7    criterion/essential eligibilities."  Do you see that?

8    A    I do.

9    Q    Can you tell me what that's referring to,

10   what that's talking about?

11   A    The math section, they do have -- you have

12   to have essential eligibility requirements to meet

13   the course.  So that would be what that phrase is

14   talking about.

15   Q    All right.  So would I be correct, then,

16   that this section -- that would have no bearing or

17   application to Mr. Saffold in the Fall 2014 semester?

18   A    Correct.

19   Q    All right.  Let me just check my notes for

20   a minute.  I think we're done or very close to being

21   done, but just give me a minute.  Okay?

22   A    Okay.

23                  (Whereupon, there was a brief

24                   pause.)

Page 37

BY MR. HOFELD:

1

2     Q     Did you ever find out why the note taker

3  that didn't show up on the one day -- why they didn't

4  show up, or what the circumstances were, or what

5  happened, anything like that?

6     A     I did.

7     Q     Do you recall that now?

8     A     I don't.

9     Q     All right.  So you would have known that

10  back then, but you don't have any memory of that now?

11     A     Correct.

12     Q     Do you have any other memory or knowledge

13  of anything else that was said or anything else that

14  happened in relation to Mr. Saffold and the Fall 2014

15  semester other than what you've already told me about

16  here today?

17     A     No.

18     Q     Last question, I think -- and please don't

19  be offended.  I have to ask this of every witness

20  that I depose.  But have you -- and I'm sure what the

21  answer is going to be.

22           But have you ever been in trouble with

23  the law in any way?

24     A     No.

1      MR. HOFELD:  Okay.  Thank you very much for

2  your time.  I think that's all of the questions I

3  have for you.  Thank you.

4      MR. CANNON:  I have no questions.  We'll

5  reserve signature.  It'll be a short one.

6         FURTHER DEPONENT SAITH NAUGHT. . .

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 39

```
 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3
      DEXTER SAFFOLD,                    )
 4                                       )
                        Plaintiff,       )
 5                                       )
           vs.                           ) No. 14 CV 07468
 6                                       )
      SOUTH SUBURBAN COLLEGE,            )
 7                                       )
                        Defendant.       )
 8

 9              This is to certify that I have read the

10    transcript of my deposition taken on the 8th day of

11    April 2016 in the foregoing cause, and that the

12    foregoing transcript accurately states the questions

13    asked and the answers given by me, with the changes

14    or corrections, if any, made on the Errata Sheet(s)

15    attached hereto.

16
                            _____
17                          GAIL BONDS-CARPENTER

18                          This _____ day
                            of _____ 2016.
19

20
                            _____
21                          Notary Public

22

23

24
```

Page 40

```
 1    STATE OF ILLINOIS    )
                           )    SS:
 2    COUNTY OF COOK       )

 3              I, Devan J. Moore, a certified shorthand

 4    reporter in and for the County of Cook and State of

 5    Illinois, do hereby certify that GAIL BONDS-CARPENTER

 6    was first duly sworn to testify the whole truth, and

 7    that the above deposition was recorded

 8    stenographically by me and was reduced to typewriting

 9    under my personal direction.

10              I further certify that the said deposition

11    was taken at the time and place specified and that

12    the taking of said deposition commenced on the 8th

13    day of April 2016 and was completed the same day.

14              I further certify that I am not a relative

15    or employee or attorney or counsel of any of the

16    parties, or a relative or employee of such attorney

17    or counsel, or financially interested directly or

18    indirectly in this action.

19
20                          Certified Shorthand Reporter
21                          License No. 084-004589

22

23

24
```

SULLIVAN REPORTING COMPANY
(312) 782-4705

Page 41

```
 1                    SULLIVAN REPORTING COMPANY
                      Two North LaSalle Street
 2                    Suite 1615
                      Chicago, Illinois 60602
 3                    (312) 782-4705

 4                    May 2nd, 2016

 5   Kusper & Raucci, Chtd.
     Mr. Daniel E. Cannon
 6   30 North LaSalle Street
     Suite 3400
 7   Chicago, IL 60602

 8   Re:  Dexter Saffold vs. South Suburban College

 9   Dear Mr. Cannon:

10   Enclosed is your copy of the deposition of GAIL
     BONDS-CARPENTER which was taken on April 8th, 2016.
11
     As signature was reserved, please arrange for the
12   deponent to review her transcript making any
     necessary corrections on the errata sheets.  Then
13   have her sign the deponent's signature page and have
     the signature notarized.
14
     Please send the original errata sheets and signed
15   deponent's certificate to Sullivan Reporting Company,
     2 North LaSalle Street, Suite 1615, and please be
16   sure to keep a copy for yourself.

17   According to the Rules of Civil Procedure for the
     U.S. District Courts, Rule 30 (e), signature must be
18   obtained within 30 days or the deposition may then be
     used fully as though signed.  Therefore, your prompt
19   attention in this matter is greatly appreciated.

20                            Sincerely,

21
                              Devan J. Moore, CSR
22                            Sullivan Reporting Company

23   Enc.
     cc:  Bryan Hofeld
24
```